648 A.2d 1025

David Kevin NORTH

v.

Kathryn Dionne NORTH.

No. 1362, Sept. Term, 1993.

Court of Special Appeals of Maryland.

Oct. 25, 1994.

James Milko (Gerald Solomon, on the brief), Greenbelt, Natalie H. Rees (Court-appointed for minor children), Towson, for appellant.

James E. Joyner, Oxon Hill, for appellee.

Marla J. Hollandsworth, Deborah Weimer, Joyce McConnell, Susan Goering, Baltimore, for amicus curiae, American Civ. Liberties Union.

Marc E. Elovitz, Ruth E. Harlow and William B. Rubenstein, New York City, for amicus curiae, American Civ. Liberties Union Foundation.

Arthur B. Spitzer, for amicus curiae, American Civ. Liberties Union Fund of the Nat. Capitol Area of Washington, DC.

Beatrice Dohrn, Legal Director of Lambda Legal Defense and Education Fund of New York, NY, Paula Brantner, Legal Director of the National Center for Lesbian Rights of San Francisco, CA, Nancy D. Polikoff, Professor of Law at the American University Washington College of Law of Washington, DC, on brief amici curiae for Lambda Legal Defense and Education Fund; Maryland Lesbian and Gay Law Associa-

tion;. National Center for Lesbian Rights; Gay and Lesbian Advocates and Defenders; Gay and Lesbian Parents Coalition International; Gay and Lesbian Parents Coalition of Metropolitan Washington; Families with Pride; Gay Fathers Coalition of Washington, DC; Alexandra Fagelson and Ronald D. Lewis in support of appellant.

Argued before WILNER, C.J., and MOYLAN, BISHOP, GARRITY, ALPERT, BLOOM, WENNER, FISCHER, CATHELL, DAVIS, MURPHY and HOLLANDER, JJ., and ROSALYN B. BELL, Judge (retired) Specially Assigned.

WILNER, Chief Judge.

On June 4, 1993, the Circuit Court for Prince George's County entered a judgment divorcing Kathryn and David North, granting custody of their three children to Mrs. North, and, with one minor modification, establishing visitation privileges for Mr. North in conformance with a *pendente lite* visitation order entered by another judge of the court in October, 1992. The effect of that last provision was to allow Mr. North unsupervised visitation from 11:00 a.m. to 6:00 p.m. on alternating Saturdays and from 2:00 p.m. to 7:00 p.m. on alternating Sundays, but to deny his request for unspecified overnight weekend and extended summer visitation.

The sole issue in this appeal by Mr. North is whether the court erred in denying that overnight and extended visitation. On the record before us, we conclude that it did. We shall remand for further proceedings.

## Factual Background

The Norths were married in 1982. They have three daughters, who, at the time of trial, were eight, five, and two years old, respectively. The parties separated in June, 1991, following Mr. North's revelation that he was HIV-positive. He claimed at the time that he had contracted the virus from a heterosexual extramarital affair. Even more upsetting, no doubt, to Mrs. North was the fact that he had learned of his HIV-positive condition in April and had continued to have

unprotected sexual relations with her during that three-month period. Mrs. North promptly had herself and the children tested; all, fortunately, tested negative.

Mr. North vacated the family home and moved in with one David York. Mr. York had been a family friend for about two years and had developed a close relationship with the North children. At Mrs. North's urging, he had been named godfather to the youngest child, Sarah. During the next year, Mr. North exercised "liberal" visitation with the children, although, from information supplied to us at oral argument and despite an assertion to the contrary in the *amicus* brief of the American Civil Liberties Union, he apparently did not have the children with him overnight.

In June, 1992, Mr. North confessed to his wife that he had, in fact, contracted the HIV virus from homosexual contact. It appears that Mr. North had his first homosexual experience in 1979 and that he continued such contacts during the marriage. He also informed Mrs. North that Mr. York was also a homosexual and HIV-positive, that North and York were lovers, that they intended to be married,[1] and that he proposed to inform the children about and expose them to his new lifestyle. At that point, Mrs. North terminated all visitation by Mr. North with the children and filed this action for divorce.

Both Mr. and Mrs. North have deep religious backgrounds. Mr. North is a Baptist minister, as was his father. From 1984 to July, 1991, he served as pastor of a Baptist church. Mrs. North attends church twice a week; her brother is a pastor, and she assisted Mr. North in his pastoral duties until the separation. In her complaint, Mrs. North alleged that, "at the time of the 'Christian' marriage of the parties, both parties agreed that their lives and the lives of any children they may have would be raised in a traditional, orthodox, heterosexual, and [C]hristian home." In violation of that commitment, she

---

**1.** Maryland law does not recognize a marriage between members of the same sex. How and where Messrs. North and York intended to marry is not clear.

averred, Mr. North "insists on engaging in homosexual activity and has threatened that should the children be with him he will expose them to a setting involving openly homosexual and lesbian couples."

In addition to her concern about the "harmful psychological [e]ffects the visitations in a homosexual and or lesbian environment would have on her minor children," Mrs. North expressed concern because of "serious health risks to her children" from Mr. North's positive HIV condition. She therefore asked that all visitation be denied and that Mr. North be enjoined from taking the children from her home.

As we observed, in October, 1992, the court entered a *pendente lite* order allowing unsupervised visitation during the specified daylight hours on Saturdays and Sundays. The order directed, however, that Mr. North "not expose the minor children of the parties to events or functions espousing his alternative lifestyle or overtly display or discuss said lifestyle with his children."

The case was heard on the merits in April, 1993. The only real issue between the parties was visitation, and that was the focus of most of the evidence. Mrs. North continued to press for no visitation because of her concerns about exposure of the children to the HIV virus and to Mr. North's homosexual lifestyle; Mr. North sought what he regarded as "standardized" visitation, including at least one overnight visit every other weekend and "maybe a couple of weeks in the summers."

Prior to this hearing, the court had directed an investigation and evaluation by the Department of Social Services (DSS) and by the court's Mental Hygiene Consultation Service. Reports were prepared by both units and forwarded to the court. The DSS report stated, among other things, that Mr. North's home, which he shared with Mr. York, was "clean, well furnished, and has adequate living space for the family," that it contained three bedrooms, and that, in any overnight visitation, the children would occupy one bedroom in which there were twin beds and a couch that opens to a bed and that

Mr. North and Mr. York would occupy the other two bed-
rooms. It stated further that:

"Mr. North's three children do not know that he is a
homosexual or HIV positive. Mrs. North does not feel it is
in the children's best interest to be told of their father's
sexuality and Mr. North is going along with his wife's
wishes in order to see his children at this time."

The report advised that both Mr. North and Mr. York were
being treated for their HIV condition and that neither had yet
developed AIDS. The investigator concluded that North and
York were "responsible, caring people who are concerned
about Mr. North's daughters and seem to be committed to
doing what is best for the children." He noted that they had
agreed not to discuss or display their sexuality to the girls
"during visits during day or evening hours" and were taking
every precaution to avoid any risk of the children acquiring
HIV. His conclusion was:

"This agency feels Mr. North has the right to standard
visitation which would include overnight visitation every
other week-end. This agency does not feel the girls are in
any danger during the visits or that the visits will adversely
affect their emotional stability."

The report of the Mental Hygiene Consultation Service was
detailed—12 pages, single-spaced—but made no recommenda-
tion with respect to the extent of visitation. The psychologist
did suggest, however, that Mrs. North felt betrayed by her
husband and may be "overusing the HIV issue to justify her
needs."

Mrs. North repeated her various concerns in her testimony.
In contrast to the DSS finding, she claimed that her husband's
home was unclean and that he was unclean in his personal
hygiene, and she gave various examples of his poor habits.
She expressed her feeling of betrayal at his homosexual
lifestyle and at his continuing to have sexual relations with her
without informing her that he was HIV-positive. She made
clear that she did not trust Mr. North to shield the children.

When asked why she halted visitation upon learning of Mr. North's and Mr. York's homosexuality, she stated:

"I didn't want my children to be [a]ffected in any kind of way with their lifestyle, their environment. I was concerned that the longer the children stayed with the two of them, that somehow the children would be damaged by their sleeping together. The children love to jump in bed with me, and when we were together, when we were married they loved to jump in bed with the two of us, and when—the fear was that they would wake up at night, and they would see that he's not in the room, and they would wonder where is my father.

Then the next thing you know you see that they go into the other man's room, and they are both on top of each other making love. The contraction of the body fluids, after they finished making love, that there is residue left on the sheets that the children may get. He's not a very clean person at all."

Mrs. North complained that her husband was a strong-willed person who will do what he wants to do: "He told me, that no matter how I felt about the children being hurt by him or whatever, he said I'm going to do what I want to do, they are my children, I don't care what you say."

Mr. North confirmed that he and Mr. York had separate bedrooms. He stated that he had complied with the restriction in the *pendente lite* order and promised that he would continue to do so. He said that he would refer all questions from the children regarding sexuality to Mrs. North. When asked on cross-examination about the unprotected sexual relations he had with Mrs. North between April and June, 1991, he said that, at that time, he was under the belief that the virus could not be transmitted in the absence of ejaculation. He denied most of Mrs. North's allegations regarding his personal habits.

Mr. York confirmed much of what Mr. North said. He asserted that neither he nor Mr. North had ever engaged in any activity that would threaten the North children with

transmission of the HIV virus, that Mr. North had good personal hygiene and kept himself clean, that in the event of overnight visitation he and Mr. North would occupy separate bedrooms, and that they would not show any "physical affection in front of the children."

The only other evidence relevant to the issue now before us came from Arlona McGill and Dr. Louis Marshall. Ms. McGill, a deacon at the church Mr. North served as pastor, testified that in the summer of 1991, after Mr. North had admitted to her that he was HIV-positive, she asked him not to serve Communion but that he insisted on doing so. Shortly thereafter, he was dismissed from his position.

Dr. Marshall was Mr. North's treating physician and was accepted as an expert in immunology and contagious diseases. He described the three documented ways in which the HIV virus can be transmitted—sexual contact, body fluids from the infected person injected into the recipient's body or mucous membranes, and transmission from mother to infant in utero, during delivery, or through breast feeding. He maintained that HIV cannot be transmitted through "casual contact," which he defined as including kissing, bathing, diaper changing, food preparation, and hand holding. He said that, although the virus has been isolated in tears and saliva, "it's never been documented that either has transmitted the viral infection from one person to another." Without objection, he opined:

"[Q] Doctor, let me turn your specific attention to the question of overnight visitation with children.

Let me preface that with the fact that during overnight visitation, as you might be well aware parents bath[e] children, prepare them for bed, and those types of bedtime activities.

Now I'd like you to contrast that with activities that take place during the day that don't take place during bedtime hours.

Is there any difference in the risk as to visitation or contact between a parent and a child from the night time period to the day time period?

A No.

Q Based on your medical expertise and your contact with Reverend North and your knowledge with both his sensitivity to HIV, do you feel that there is any reason why Reverend North shouldn't have visitation with his children?

A No, I don't.

Q Do you see that there is any reason why visitation shouldn't be overnight?

A No, I don't.

Q Do you see there being any reason why Reverend North shouldn't be able to take the children on vacation?

A No, I don't."

At the conclusion of the evidence, the judge announced her findings from the bench. Initially, she opined that the issues relevant to visitation were "[t]he medical condition of Mr. North with HIV virus, positive, and his open homosexual liaison with one David York."

The judge decried that she did not have a crystal ball to determine whether Mr. North would live up to his promises to conduct his "future life with the homosexual relationship" appropriately and concealed from the children, and thus could look only at his past actions. In that regard, she observed that his continuing to have unprotected sexual relations with Mrs. North after learning that he was HIV-positive "tells me that he is not being candid and just out is being very deceitful with his wife and his family." She noted as well Mrs. North's testimony that he would do whatever he wanted to do, which, the court concluded, was unrebutted. "Most importantly and most impressively," the court added, was Deacon McGill's testimony about Mr. North serving Communion after he was asked not to do so. From all of this, the court found:

"Therefore, the Court feels that he's going to have his own lifestyle. He's chosen to have his own lifestyle with

David York. He's going to have his own lifestyle, the congregation be damned, his wife be damned, his children be damned, he's going to do it any way, and for the time being the Court feels for these reasons, I am not going to trust Mr. North with his promise of refraining from homosexual displays of affection, and for caring for his children overnight.

So, I am going to incorporate Judge Woods initial order in this case."

Having made this pronouncement, the court directed the parties to return to the Mental Hygiene Consultation Service a year hence for another evaluation. The judge said that she intended to monitor the case to make certain that Mr. North doesn't break "any kind of promise" or violate her order "in any way." If he abides by the order, she said, she "would take another look at it."

The court summarized these findings in a written memorandum filed contemporaneously with its judgment. The memorandum made clear that the court was "discrediting" Mr. North's promise to act properly "in front of the children" because of his past conduct, finding him to be "not candid," "not responsible," and "deceitful." The court concluded "as a matter of law" that "it is in the best interests of the children not to grant [to Mr. North] the right of overnight visitation."

### The Issues

In his initial brief, Mr. North characterized the issue on appeal as whether the circuit court "applied an improper legal standard and committed reversible error by denying appellant overnight visitation with his children based solely on the court's speculation that appellant would fail to shield his homosexual lifestyle from the children." Following oral argument before a three-judge panel, the Court concluded that, given the record as we have outlined it, a more focused argument would be helpful, so we directed the parties to brief and argue before the entire Court, sitting in banc, three additional questions:

(1) Where a non-custodial parent professes an active homosexual lifestyle, including living together and having regular sexual contact with the parent's homosexual lover in the parent's home, can a court infer that exposure of the parent's children to that lifestyle through unsupervised overnight visitation at the parent's home would not be in the best interest of the children;

(2) Does the evidence in this case support such an inference; and

(3) If the answers to Questions (1) and (2) are "yes," what, if any restrictions on such exposure would be permissible?

As the result of a reexamination of the record in light of the colloquy between the Court and counsel at the in banc hearing, we are now convinced that the issues initially raised by us are really not in the case. Counsel for Mrs. North acknowledged that it would be inappropriate for a court to infer unfitness for visitation solely because of a non-custodial parent's HIV status or his or her "homosexual lifestyle," and asserted that the circuit court had not based its decision on such an inference.

 We agree that the denial of overnight and extended visitation was not based on any finding of unfitness inferred solely from Mr. North being HIV-positive or because he is a homosexual or leads a "homosexual lifestyle" but was derived instead from the court's perception, based on the evidence it heard, of potential harm to the children that might arise from such visitation. Moreover, although at different points during the trial and at the beginning of her concluding remarks, the judge expressed concern over Mr. North's "medical condition," it appears clear from the court's final pronouncements and written memorandum that the disqualifying factor was not Mr. North's HIV status so much as the perceived harm arising from exposure of the children to his "homosexual lifestyle." This is consistent with the complaint made by Mr. North in his

initial brief and will henceforth be the focus of this Opinion.[2]

*Discussion*

This case, like all child custody and visitation disputes, is governed by certain well-established general principles. The first of these is that "[o]verarching all of the contentions in disputes concerning custody or visitation is the best interest of the child[ren]." *Hixon v. Buchberger*, 306 Md. 72, 83, 507 A.2d 607 (1986). A second precept, well-stated in 2 Nelson, *Divorce*, § 15.26 (2d ed.) and applied consistently by the Maryland courts, is that

> "[a] parent whose child is placed in the custody of another person has a right of access to the child at reasonable times. The right of visitation is an important, natural and legal right, although it is not an absolute right, but one which must yield to the good of the child."

*See Radford v. Matczuk*, 223 Md. 483, 488, 164 A.2d 904 (1960); *In re Jessica M.*, 312 Md. 93, 113–14, 538 A.2d 305 (1988); *Shapiro v. Shapiro*, 54 Md.App. 477, 482, 458 A.2d 1257 (1983).

■ We are not dealing here, of course, with the denial of all access to the North children, but only a limitation on access. The ultimate question is whether that limitation is a reasonable one—whether it improperly denies Mr. North, and the children, access to each other "at reasonable times." The determination of what is reasonable, in this context, is a matter resting within the trial court's discretion. *Odunukwe v. Odunukwe*, 98 Md.App. 273, 288, 633 A.2d 418 (1993).

In reviewing a decision regarding custody or visitation, we apply the procedure mandated in *Davis v. Davis*, 280 Md. 119,

---

**2.** Although we do not believe that the court actually based its decision not to allow overnight visitation on Mr. North's HIV status, to the extent that that question resurfaces on remand, we would hold that a child's visitation with a non-custodial HIV-positive parent cannot be restricted on the basis of that parent's HIV status unless the court finds that visitation without that restriction might endanger the child's physical health or impair his or her emotional development.

125–26, 372 A.2d 231, *cert. denied,* 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977), *reh'g denied,* 434 U.S. 1025, 98 S.Ct. 754, 54 L.Ed.2d 774 (1978):

> "When the appellate court scrutinizes factual findings, the clearly erroneous standard of [Md. Rule 8–131(c) ] applies. If it appears that the chancellor erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion."

*See also McCready v. McCready,* 323 Md. 476, 484, 593 A.2d 1128 (1991); *Lipiano v. Lipiano,* 89 Md.App. 571, 576, 598 A.2d 854 (1991), *cert. denied,* 325 Md. 620, 602 A.2d 710 (1992).

"Abuse of discretion" is one of those very general, amorphous terms that appellate courts use and apply with great frequency but which they have defined in many different ways. It has been said to occur "where no reasonable person would take the view adopted by the [trial] court," *In re Marriage of Morse,* 240 Ill.App.3d 296, 180 Ill.Dec. 563, 571, 607 N.E.2d 632, 640 (1993) or when the court acts "without reference to any guiding rules or principles." *Long John Silver's, Inc. v. Martinez,* 850 S.W.2d 773, 775 (Tex.App.1993). It has also been said to exist when the ruling under consideration "appears to have been made on untenable grounds," *Halloran v. Town of North Canaan,* 32 Conn.App. 611, 630 A.2d 145, 147 (1993), when the ruling is "clearly against the logic and effect of facts and inferences before the court," *Shockley v. Williamson,* 594 N.E.2d 814, 815 (Ind.App.1992), when the ruling is "clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result," *Novak v. Novak,* 2 Neb.App. 21, 508 N.W.2d 283, 288 (1993), when the ruling is "violative of fact and logic," *Young v. Jangula,* 176 Mich.App. 478, 440 N.W.2d 642, 643 (1989), or when it constitutes an "untenable judicial act that defies

reason and works an injustice." *Moore v. Bd. of Educ. of Fulton School,* 836 S.W.2d 943, 948 (Mo.1992).

█ There is a certain commonality in all of these definitions, to the extent that they express the notion that a ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling. The decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable. That kind of distance can arise in a number of ways, among which are that the ruling either does not logically follow from the findings upon which it supposedly rests or has no reasonable relationship to its announced objective. That, we think, is included within the notion of "untenable grounds," "violative of fact and logic," and "against the logic and effect of facts and inferences before the court."

The basic historical facts found by the court are not seriously contested by appellant, although he does challenge the court's credibility determination—its conclusion that he could not be trusted to shield the children from his new lifestyle—in light of the fact that there was no evidence whatever before the court that, in the six months since the *pendente lite* injunctive provision, he had ever broken his commitment not to subject the children to that lifestyle. We find no fault with the court's determination in that regard. Appellant's deception of his wife, his reckless endangerment of her life, his initial dissembling as to the manner in which he contracted the HIV virus all suffice to cast some doubt as to his future trustworthiness, a doubt that is not necessarily dispelled by his acquiescence during the pendency of the litigation.

█ Our concern is not with the court's fact-finding; nor do we believe the restriction it imposed to be inherently unreasonable or unacceptable in any circumstance. A non-custodial parent is not entitled to overnight or extended visitation as a matter of law, and, indeed, Mr. North does not suggest to the contrary. The problem is that the restriction does not follow

logically from the facts found by the court and has no reasonable relationship to its announced objective.

██ The court declared from the bench that it did not trust Mr. North to keep his promise of "refraining from homosexual displays of affection, and for caring for his children overnight" and, for that reason, intended to continue the *pendente lite* order limiting his visitation to daylight hours on Saturdays and Sundays.[3] In its memorandum, the court refined that to state that it did not trust Mr. North "not to display his homosexual lifestyle to the children." In so doing, the court appeared to abandon any concern over the prospect of Mr. North (or Mr. York) infecting the children with the HIV virus. Its attention turned entirely to Mr. North's "lifestyle." Nowhere, however, did the court indicate what it meant by "homosexual displays of affection" or "homosexual lifestyle." Mrs. North, as we noted, was concerned about the children actually witnessing their father and Mr. York engaged in homosexual love-making, but the court made no finding as to the likelihood of that occurring. It made no finding as to whether North and York would indeed maintain separate bedrooms when the children were present.

The lack of specificity is important; it is what initially caused this Court to order reargument and continues to create a problem. On the one hand, the court expressly incorporated into its order the provisions in the *pendente lite* order that Mr. North not expose the children to "events or functions espousing his alternative lifestyle or overtly display or discuss his lifestyle with his children" at the same time it expressly found that it could not trust Mr. North to abide by those restrictions.

---

**3.** The court did not explain what it meant by the phrase "caring for his children overnight." Even the grammatical context is unclear. There was no evidence, and no argument by Mrs. North, that Mr. North did not have the proper facilities to care for the children on an overnight visit; indeed, the uncontradicted evidence was to the contrary. We must assume, therefore, that the court used that phrase to express its concern about the children being exposed to "homosexual displays of affection" during the evening hours. Given the evidence in the case, everyone's focus on Mr. North's lifestyle, and the context of the remark, that seems to be the only reasonable hypothesis.

That rather obvious inconsistency would probably have been harmless but for the court's resting its decision not to allow overnight visitation on the credibility finding, ignoring completely the effect of its own injunction.

If what truly led the court to deny overnight visitation was its fear that Mr. North *would* expose the children to "events or functions espousing his alternative lifestyle" or that he *would* "display or discuss said lifestyle" with them, we fail to see how a restriction on overnight visitation would even abate, much less preclude, those perceived harms in light of the unsupervised visitation allowed during the daylight hours on Saturdays and Sundays. If Mr. North is intent on engaging in any of that prohibited conduct, he could just as readily engage in it during the day as at night. There is no restriction on where he can take the children during those daylight hours; there is no requirement that they not be taken to the North–York home where they could easily view the living arrangements, that they not take their meals, or even naps, there, or that Mr. York not be in their presence. There was no evidence before the court, and certainly no finding by it, that Mr. North was more likely to expose the children to "events or functions" espousing a homosexual lifestyle on Friday or Saturday evening than during the afternoon.

This, and this alone, is what convinces us that the court abused its discretion. The restriction does not follow from the findings made by the court and does not, and cannot, achieve the only objective asserted for it by the court. It is therefore arbitrary, violative of fact and logic, untenable.

The error here is essentially one of omission, rather than commission. It is not remedied by simply striking a provision in the order, or by vacating or reversing the order. To hold that there was no basis in the court's findings for limiting visitation to that stated in the *pendente lite* order is not to hold that Mr. North is entitled to any specific time or degree of overnight or summertime visitation or that other, reasonable restrictions could not be placed on such visitation. That is something the circuit court will have to determine, and we

shall remand the case for that purpose. We note that more than a year has passed since the court made its decision, and it anticipated reconsidering the matter of visitation in any event. It should do so based on the current situation, examining how the children have fared during the year, whether Mr. North has abided by the injunctive provisions in the order, and any other factor that the evidence demonstrates is relevant to what is in the best interest of the children.

In the exercise of our discretion, we shall assess the costs, including the cost of court-appointed counsel for the children, equally between Mr. and Mrs. North.

CASE REMANDED WITHOUT AFFIRMANCE OR REVERSAL FOR FURTHER PROCEEDINGS; ALL COSTS, INCLUDING COSTS FOR COURT–APPOINTED COUNSEL FOR THE CHILDREN, TO BE DIVIDED EQUALLY BETWEEN APPELLANT AND APPELLEE.

BISHOP, Judge, dissenting in which FISCHER, Judge, concurs.

" 'The right of visitation is an important, natural, and legal right, although it is not an absolute right, but is one which must yield to the good of the child.' " *Radford v. Matczuk*, 223 Md. 483, 164 A.2d 904 (1960) (quoting 2 Nelson, *Divorce*, § 15.26 (2d ed)) "Visitation rights, however, are not to be denied even to an errant parent unless the best interests of the child would be endangered by such contact." *Roberts v. Roberts*, 35 Md.App. 497, 507, 371 A.2d 689 (1977). In the case *sub judice*, the chancellor declined to extend Mr. North's visitation with his children to include unsupervised overnight visits. As the majority notes "the denial of overnight and extended visitation was not based on any finding of unfitness inferred *solely* from Mr. North being HIV-positive or because he is a homosexual or leads a 'homosexual lifestyle . . .' " The majority also states that, based on the evidence it heard, the chancellor denied overnight and extended visitation because she found that potential harm to the children might arise from extended visitation.

This Court is bound by the chancellor's factual findings unless such findings are clearly erroneous. Here, the chancellor found (1) that North learned that he was HIV-positive in April, 1991 and, until June, 1991, continued to engage in unprotected sexual relations with his wife, without her knowledge that he was infected with the HIV virus; (2) that it was not until June, 1992, that Mr. North confessed to Mrs. North that he was a homosexual and had contracted the HIV virus through homosexual activity; (3) that during his marriage, Mr. North engaged in homosexual relationships; and (4) that Mr. North "is not candid; is not responsible and is deceitful."

According to the majority, the proper disposition of this case is to remand, without affirmance or reversal, to the circuit court for further proceedings. The majority is convinced that, although the chancellor's fact-finding and the visitation restriction she imposed on Mr. North are acceptable, the chancellor abused her discretion because she denied extended overnight visitation based on her fear that Mr. North could not be trusted to refrain from displaying or discussing his homosexual lifestyle with his children. The majority is of the opinion that the restriction on visitation does not follow logically from the court's factual findings and bears no reasonable relationship to its announced objective.

The Court of Appeals stated in *Davis v. Davis,* 280 Md. 119, 124, 372 A.2d 231 (1977) that a chancellor's conclusion is technically not a matter of fact and, therefore, the clearly erroneous standard has no applicability. In addition, the *Davis* court recognized that appellate courts should not exercise "their own 'sound judgment' in determining whether the conclusion of the chancellor was the best one." *Id.* at 125, 372 A.2d 231. Rather, "it is within the sound discretion of the chancellor to award custody according to the exigencies of each case ..." *Id.*

Furthermore, in *Ross v. Hoffman,* the Court of Appeals stated that

[t]he ultimate conclusion as to the custody of a child is within the sound discretion of the chancellor. That conclu-

sion is neither bound by the strictures of the clearly erroneous rule, that rule applying only to factual findings of the chancellor in reaching the conclusion, nor is it a matter of the best judgment of the reviewing court. It is not enough that the appellate court find that the chancellor was merely mistaken in order to set aside the custody award. Rather, the appellate court must determine that the judicial discretion the chancellor exercised was clearly abused.

*Ross v. Hoffman,* 280 Md. 172, 186, 372 A.2d 582 (1977). "[W]hen the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion. *Davis v. Davis,* 280 Md. 119, 126, 372 A.2d 231 (1977). I agree with the majority that the chancellor was imprecise in her reasoning and never articulated how Mr. North's homosexual relationship with his partner detrimentally effected his children, *see Swain v. Swain,* 43 Md.App. 622, 406 A.2d 680, *cert. denied,* 286 Md. 754 (1979); however, I perceive no clear abuse of discretion by the chancellor.

According to the majority, the chancellor refused to extend Mr. North's visitation rights because he was not credible and could not be trusted to conceal his homosexual lifestyle from his children. This conclusion, claims the majority, demonstrates an abuse of discretion because it is inconsistent with the existing visitation award that permits Mr. North unsupervised daytime visitation with his children. The majority asserts that there was no evidence before the court that Mr. North was more likely to expose his children to his "homosexual lifestyle" during the evening than during the afternoon, and therefore, the chancellor's restriction on overnight visitation was arbitrary, violative of fact and logic, and untenable. I disagree. Setting aside the issue of Mr. North's homosexuality, adequate factual findings still exist to support the chancellor's ultimate decision to deny Mr. North's request for extended visitation.

The chancellor found that Mr. North had affairs during his marriage to Mrs. North and that Mr. North had unprotected sexual relations with Mrs. North for almost three months before informing her that he was HIV positive. The chancellor also noted that she found Mr. North to be irresponsible and deceitful, and that, in her opinion, his "future actions would be consistent with [his] past actions." The majority cannot dispute that, sexual preference notwithstanding, one who carries the awesome burden of being infected with an incurable, highly contagious disease and, yet, recklessly engages in conduct likely to infect an innocent, unwitting person lacks sound judgment.

Mr. North testified that he wanted overnight visitation with his children because

> [t]he time we share is so short and neither they nor I like it, and there are so many things you can do. David and I do a lot of camping, and there's a lot of places that maybe [sic] a little bit farther away like two or three hours, and like I said if you want to go to Kings Dominion or farther away places, with the short time frame, you never can do any of those kinds of things.

Taking the children camping, to an amusement park, or to "farther away" places demands that the adult in charge be reliable, responsible, and capable of exercising sound judgment.

Under the *Davis* standard, the chancellor's *ultimate* conclusion should only be disturbed upon a clear showing of abuse of that discretion. *Davis*, 280 Md. at 125, 372 A.2d 231. The *Davis* standard does not require that a reviewing court disturb the chancellor's *ultimate* conclusion if the chancellor establishes an incorrect nexus between the findings of fact and that conclusion. "When the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should not be disturbed [absent an abuse of discretion]" *Id.* at 126, 372 A.2d 231. Therefore, under *Davis*, if, after our review of the record, we

can draw an appropriate nexus between the factual findings and the chancellor's ultimate conclusion, we should not interfere with the chancellor's decision. We are permitted to establish a nexus independently of the chancellor as long as the record supports the nexus. "[W]here the record in a case adequately demonstrates that the decision of the trial court was correct, although on a ground not relied upon by the trial court and perhaps not even raised by the parties, an appellate court will affirm. In other words, a trial court's decision may be correct although for a different reason than relied on by that court." *Robeson v. State,* 285 Md. 498, 502, 403 A.2d 1221 (1979).

I see no reason why, in light of the chancellor's factual findings, the chancellor's decision not to extend Mr. North's access to his children to include overnight visitation constitutes an abuse of discretion.

The chancellor is vested with broad discretion in awarding custody and visitation because only the chancellor "sees the witnesses and the parties, hears the testimony, and has the opportunity to speak with the child; he [or she] is in a far better position than is an appellate court ... to weigh the evidence and determine what disposition will best promote the welfare of the minor." *Davis,* 280 Md. at 125, 372 A.2d 231. Based upon the foregoing factual findings, there is a clear nexus between the facts, which the majority concedes are not clearly erroneous, and the chancellor's decision to deny Mr. North's request to extend visitation to include overnight visits with his children. The chancellor found, as a matter of fact, that, although Mr. North loved his children and his children loved him, Mr. North had repeatedly deceived his wife, his family, and his congregation. The chancellor found that, after engaging in affairs during his marriage, Mr. North learned that he was infected with the HIV virus and, nevertheless, made a conscious choice to continue to have unprotected sex with his wife. According to the chancellor Mr. North was a self-centered individual who was going to do what he wanted to do, "the congregation be damned, his wife be damned, his

children be damned." Also, the chancellor concluded that Mr. North "is not candid; is not responsible and is deceitful."

We agree that there is no evidence in the record that Mr. North's homosexuality would likely cause harm to his children or that Mr. North's homosexuality, considered alone, should preclude overnight visitation; however, there is evidence in the record that Mr. North's proven poor judgment and reckless behavior could result in harm to his children if his visitation with his children were extended for a significant amount of time. Although the chancellor failed to articulate the nexus, the record demonstrates that a nexus exists between Mr. North's deceitfulness and recklessness, and the potential that such behavior could. result in harm to the children if visitation were extended for overnight visitation or for substantially longer periods of time. For example, taking the children on overnight camping trips or on weekend excursions to visit Mr. North's companion's parents in Maine requires the supervision of a reliable, responsible adult. The chancellor did not find Mr. North to be such a person. I think it is also important to note that, although she denied Mr. North's request for extended visitation, the chancellor did indicate that she would monitor the case and "take another look at it" in a year. In other words, Mr. North may be able to demonstrate to the chancellor within that year's time that he is a reliable, responsible person capable of exercising sound judgment, and that overnight visitation would not adversely affect the best interests of the children.

"Visitation is a matter affecting the best interest of the children and a matter over which the chancellor must exercise his or her own discretion." *Odunukwe v. Odunukwe,* 98 Md.App. 273, 288, 633 A.2d 418 (1993). "The cases emphasize that there should be reasonable access to the child upon such terms as the Chancellor may prescribe, and that he [or she] retains jurisdiction to vary or modify such an order." *Myers v. Butler,* 10 Md.App. 315, 318, 270 A.2d 341 (1970). Mr. North has reasonable access to his three children. Prior to the hearing on extending visitation, Mr. North had unsupervised visitation from 11:00 a.m. to 6:00 p.m., on alternating

Saturdays, beginning October 3, 1992 and unsupervised visitation from 2:00 p.m. to 6:00 p.m. on alternating Sundays, beginning October 4, 1992. After the hearing on extending visitation, the chancellor extended visitation by allowing Mr. North access to his children from 2:00 p.m. to 7:00 p.m. on alternating Sundays.

The United States Supreme Court has held that "[i]t would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appellate court to formulate." *Securities and Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). This, however, is precisely what the majority has ordered in the case *sub judice.* Other grounds exist in the record of this case to validate the chancellor's final determination denying Mr. North's request for extended visitation. Because I perceive no abuse of discretion on the chancellor's part, I would affirm the ultimate decision in this case, albeit not for the reasons stated by the chancellor but for the above-stated reasons that the record adequately supports.

CATHELL, Judge, dissenting.

I dissent from that portion of the majority's opinion remanding the matter to the trial court for a reconsideration of what Judge Melbourne meant when she imposed a restriction on visitation based upon her belief that Mr. North would not protect the children from his homosexual lifestyle.

In my view, Judge Melbourne made an inference that, given appellant's particular homosexual lifestyle and his long-standing pattern of deceit and untrustworthiness, including his failure to shield a former family member from the risk of HIV infection by engaging in unsafe sex with her,[1] he could not be

---

1. His assertion that he believed that he could shield her from infection by failing to ejaculate is ridiculous. The contact occurred in 1991. According to the record, appellant has the following degrees: a Bachelor's degree in Music, Masters in Divinity, Bachelor's degree in Physics,

trusted to shield the children from conduct she deemed potentially adverse to the children's best interests. On the basis of the evidence in this case, I believe that inference was permissible. I explain.

When persons, homosexual or heterosexual, by their past activities have evinced a long term course of contemptible and despicable conduct, such as occurred here, I do not believe trial courts need the services of social scientists to make an inference that reasonable restrictions may be placed on the contacts that children, by virtue of their parentage, necessarily must have, in order to guard those children from a parent who has proven to be despicable. These types of limiting restrictions, in my view, are appropriate to protect the best interests of such children.

As I perceive that the majority's remand is only going to result in another appeal to this Court (if indeed Mrs. North, who appears to be without the help of others, can afford it), I shall reserve much of the balance of my comment as to why I believe that inference was permissible until that time. Were I to fully comment now, I would hold that the homosexual issue was properly before the trial court and was decided by it.

The majority's decision states that the "lack of specificity ... is what initially caused this Court to order reargument...." That is not my recollection. Reargument was ordered solely because of the procedural status of this case after the original oral argument and conference.

Additionally, the majority fails to see how an overnight restriction on visitation would "even abate" the trial court's perception of harm from appellant's lifestyle, given that unsupervised visitation was allowed during daylight hours. The majority fails to perceive that the opportunity for sexual activity, homosexual or heterosexual, is more frequent during nighttime hours, especially in a home environment—where the

---

and Masters in Environmental Science. By 1991, even uneducated persons had been made aware of the dangers of unprotected sex. This current assertion, made for the first time at the hearing below, is typical of appellant's pattern of past misconduct.

beds are. I respectfully suggest that that is when persons normally, or at least more frequently, go to bed together. While Mr. North—or anyone—certainly could engage in homosexual (or heterosexual) acts in the daytime with any willing partner, anywhere, normally such activity is more likely to occur in the evening, in the home, and in bed. That fact, to me, is obvious. In my view, the majority's statement, that Judge Melbourne's position is "arbitrary, violative of fact and logic, untenable," is wrong. I believe it to be almost universally understood that sexual activity, though certainly possible almost anywhere, almost anytime, is more likely to occur at night, in bed.

The majority's decision not to resolve the issue avoids the homosexuality issue and any resultant controversy regardless of the nature of that resolution, especially now that the national homosexual rights groups have been permitted to insert themselves into this private visitation dispute. Provided that Mrs. North has sufficient resources to continue the battle, the controversy will not now go away. Its resolution has only been delayed, not avoided.

Moreover, were appellant heterosexual and had his misconduct been based on heterosexual misconduct, I believe the position taken by Judge Melbourne, *i.e.*, putting some limitations on a contemptible, despicable parent's contacts with his children, would be upheld. I do not believe the issue should be treated differently because of appellant's homosexuality and the support he has elicited from the national homosexual rights movement.

In my view, what has occurred to Mrs. North is appalling. This woman was lied to, albeit impliedly, when Mr. North married her without informing her of his homosexuality as well as his past and then current homosexual conduct (a deceit particularly offensive given Mrs. North's known religious background and feelings and Mr. North's status as a Baptist minister). She was then deceived throughout the marriage by Mr. North's admitted patronage or visitation in homosexual bathhouses where, according to him, as he later told her, he

went to "get sexual desires fulfilled." She was deceived again by him, at great risk to her of disease and even death, when he, knowing that he was HIV positive, had unsafe sex with her. She was deceived yet again when he later lied and told her he had become HIV positive as a result of heterosexual contacts. Even if it was pure coincidence that Mr. York was also homosexual, and even if his homosexuality was unknown to Mr. North at the time of the naming of Mr. York as the children's godfather,[2] Mr. North, at a minimum, began a homosexual affair with one of the parties' closest friends, Mr. York, almost immediately upon the separation. He then, after Mrs. North began this litigation, with what can best be described as "unmitigated gall," counterclaimed for alimony stating that he was unable to find employment because he was HIV positive, and that Mrs. North should thus be required to support him. Appellant's conduct has been no less contemptible because he is a homosexual. Had his conduct been heterosexually based, it would also have constituted vile conduct.

As a result of a prehearing conference, Judge Harrell, of this Court, executed an "Order Limiting Issues" that limited the issue to be resolved by us to:

a. May the circuit court deny overnight visitation to an HIV-positive, avowedly homosexual father, based solely on the court's disbelief of the father's representation that he would not display his homosexual lifestyle to his children.

An appeal has been taken in which appellant expressly raised and argued the homosexual issue the appeal had been limited to; an issue the majority's decision now avoids. During the initial oral argument, appellant's counsel was repeatedly asked if he conceded that the homosexuality issue was before the court. The responses were always affirmative.

---

**2.** Mr. York, who recognized his homosexuality at age 16, also has fathered a child during a heterosexual cohabitation. He likewise failed to inform that woman that he was a practicing homosexual. The record reveals an earlier past arrest of Mr. York in respect to violations of what may be loosely termed as nuisance statutes during a police sweep of a park frequented by homosexuals in New York City.

After a somewhat extended period of consideration, and, as I view it, as a result of procedural problems only, this Court ordered a reargument on three interrelated questions:

(1) Where a non-custodial parent professes an active homosexual lifestyle, including living together and having regular sexual contact with the parent's homosexual lover in the parent's home, can a court infer that exposure of the parent's children to that lifestyle through unsupervised overnight visitation at the parent's home would not be in the best interest of the children;

(2) Does the evidence in this case support such an inference; and

(3) If the answers to Questions (1) and (2) are "yes," what, if any restrictions on such exposure would be permissible?

During the reargument, appellant's counsel was again asked if he considered that the homosexuality issue was an issue to be considered on appeal. Again, he responded in the affirmative. Nonetheless, after that subsequent *en banc* oral argument and conference, the majority says that it is "now convinced that the issues initially raised by us are really not in the case." The issue the majority says was "initially raised by us" but now says is really not in the case was, first of all, not initially raised by us but by the parties' stipulation endorsed by this Court's initial limiting order. Furthermore, as a result of that prehearing conference, stipulation, and limiting order, it is the only issue that has ever been in this case on appeal.

The prehearing rule under which the prehearing conference was held, Md. Rule 8–206 "PREHEARING PROCEDURE" subsection (b), notes that the purpose of such a conference is "to discuss agreements by the parties regarding ... limitation of the issues...." Subsection (c) **"Order"** provides that "the judge shall enter an order reciting the action taken and any agreements reached by the parties." In *B & K Rentals and Sales Co. v. Universal Leaf Tobacco Co.*, 319 Md. 127, 133–34, 571 A.2d 1213 (1990), a case involving whether the appeal was limited by language in an order of appeal, the Court of

Appeals, in holding that such language in that order did not limit that appeal, pointed out the proper procedure for limiting issues on appeal, saying:

Instead, the designation of issues on appeal is a function of the information report required by Rule 8–205, the prehearing conference under Rule 8–206(b), and the briefs.

While I believe the issue was sufficiently presented below and correctly decided, the majority disagrees that the issue was presented. If appellant has appealed to us on an issue not sufficiently presented below, then he failed to preserve that issue for appellate purposes. Md. Rule 8–131.

I respectfully suggest that when appellant sought reversal, it was, and is, appellant's burden to establish that the issue he presents was the issue resolved below. I would submit that if it is the majority's view that the issue to which this appeal has been limited by appellant's stipulation and this Court's order was not sufficiently presented below by appellant for us to· now consider it, then it has not been preserved. Appellant has thus failed to meet his burden on appeal and the case should be affirmed, not remanded to afford appellant another opportunity to do correctly that that he failed to do the first time.

However, the majority remands the case without resolving the issue we limited the case to. In so doing, the majority requires the parties, basically, to return to the trial court where that court is given no guidance by us as to the underlying issue we, upon agreement of the parties, initially ordered presented to us and subsequently requested be reargued before us.

Rather than resolving the issue, one way or the other, the majority's remand now forces Mrs. North, a woman I perceive to have been emotionally raped, criminally victimized,[3] and

---

**3.** Section 18–601.1 of the Health General Article provides that the knowing transfer of the HIV virus is a criminal act subject to penalty of three years imprisonment. Article 27, § 120 "Reckless Endangerment" provides that any person who recklessly engages in conduct creating a

physically endangered by Mr. North, to continue a course of expensive litigation, now additionally opposed by the full array and resources of the national homosexual rights movement.

I believe that the majority's position is incorrect. I also believe that what has occurred to Mrs. North is wrong. In *Schroeder v. C., R.I. & P.R. Co.*, 47 Iowa 375, 379 (1877), the Court noted:

> [I]t is well understood that exact justice cannot, because of the inability of courts to obtain truth in entire fullness, be always administered. We are often compelled to accept approximate justice as the best that courts can do in the administration of the law. *But, while the law is satisfied with approximate justice where exact justice cannot be attained, the court should recognize no rules which stop at the first when the second is in reach.* [Emphasis added.]

I cannot join the majority.

MURPHY, Judge, dissenting.

Although I agree with much in the majority opinion, I would affirm the circuit court and assess all costs—including the cost of appointed counsel—against Mr. North. The majority fails to see how a restriction on overnight visitation would abate the prohibited conduct because Mr. North could expose the children to homosexual displays of affection during daylight hours on Saturdays and Sundays. The chancellor obviously concluded that Mr. North would be less likely to engage in the prohibited conduct during those hours. That conclusion is not untenable. The fact that Mr. North could break his promise during the day does not require that he be given the opportunity to do so at night.

The majority found no fault with the chancellor's credibility determination. That determination is more than sufficient to

---

substantial risk of death or serious injury commits a criminal offense subject to five years imprisonment. *See also United States v. Joseph,* 37 MJ 392 (CMA 1993) in which a person who knew he was HIV positive had protected sex in 1989 with a partner *without* telling the partner he was HIV positive. The protection failed and the partner contracted the virus. Joseph was found guilty of aggravated assault and battery.

support the conclusion that Mr. North's visitation should be supervised at all times. It is true that the overnight visitation restriction cannot achieve the objective asserted for it by the circuit court. A restriction is reasonable, however, as long as it furthers a proper objective. This one does.

It is now virtually certain that, on remand, Mr. North will either be denied unsupervised visitation of any duration or be granted unsupervised overnight visitation. We should not make it more difficult for the chancellor to arrive at a middle ground. On the findings of fact made in this case, the chancellor did not abuse her discretion by denying Mr. North's request for overnight visitation.