*Darius Tarik Johnson v. State*, No. 2444 of the 2019 Term, Opinion by Moylan, J.

HEADNOTES:

DECLARATION OF MISTRIAL – A RETRIAL FOLLOWING A MISTRIAL; A DOUBLE JEOPARDY PROBLEM – THE MANIFEST NECESSITY EXCEPTION – STANDARD OF APPELLATE REVIEW – MANIFEST NECESSITY IN THIS CASE – A DYSFUNCTIONAL JURY – THE DECLARATION OF MISTRIAL – FAIRNESS AND IMPARTIALITY DO NOT GUARANTEE UNANIMITY – A TREACHEROUS ALTERNATIVE

Circuit Court for Prince George's County
Case No. CT 171198B

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2444

September Term, 2019

_____

DARIUS TARIK JOHNSON

V.

STATE OF MARYLAND

_____

Leahy,
Gould,
Moylan, Charles E., Jr.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed:  October 1, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

On April 1, 2019, the appellant, Darius Tarik Johnson, went on trial before a jury, presided over by Judge Michael R. Pearson, in the Circuit Court of Prince George's County. He was being tried on the five counts of 1) murder, 2) armed robbery, 3) conspiracy to commit armed robbery, 4) the use of a firearm in the commission of a crime of violence, and 5) the use of a firearm in the commission of a felony.

At the end of the third day of trial, April 3, 2019, the State rested and the defense also rested without calling any witnesses. On the morning of April 4, 2019, the fourth day of trial, the jury began its deliberations at 10:14 a.m. Without having reached a verdict, the jury was excused for the day at 5:44 p.m. The jury resumed its deliberations on the morning of April 5, 2019, the fifth day of trial and the second day of jury deliberations. At a significantly later time on April 5, 2019, Judge Pearson found it necessary to declare a mistrial because of his belief that the jury would unlikely be able to reach a unanimous verdict. A more detailed narration of the events leading up to the declaration of a mistrial will be presented infra.

### A Retrial Following A Mistrial; A Double Jeopardy Problem

Following the mistrial, the charges against the appellant, of course, remained pending. On January 15, 2020, the appellant filed a Motion to Dismiss Indictment on Double Jeopardy Grounds. A hearing was held on that motion on February 7, 2020, before Judge Pearson. With respect to the controlling Double Jeopardy law, there is no dispute. Ordinarily, once a defendant is placed in jeopardy, he has the right to have the trial completed by the tribunal that had been first empaneled to hear it. If a mistrial is declared over the defendant's objection, a retrial is presumptively forbidden by the Double Jeopardy

Clause. <u>Arizona v. Washington</u>, 434 U.S. 497, 503-505, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978).

## The Manifest Necessity Exception

There is, however, a notable exception to that provision. "At times the valued rights of a defendant to have his trial completed by the particular tribunal summoned to sit in judgment on him may be subordinated to the public interest—when there is an <u>imperious necessity</u> to do so." <u>Downum v. United States</u>, 372 U.S. 734, 736, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963). See also <u>United States v. Jorn</u>, 400 U.S. 470, 485, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971). The presence or absence of imperious or manifest necessity for the mistrial is, indeed, the only issue before us in this case. The law in this case is not in dispute.

In denying the appellant's motion to dismiss the charges against him on Double Jeopardy grounds, Judge Pearson reasserted his belief that there had been a manifest necessity for the declaration of a mistrial in the appellant's case.

> <u>It's still my perception that there was manifest necessity for the granting of a mistrial</u> because <u>there was no viable alternative at that point</u> that would continue deliberations with the assurance that all 12 jurors would be fair and impartial in their assessment of the evidence.

(Emphasis supplied.)

## Standard Of Appellate Review

That is, indeed, the only issue before us. Was there a manifest necessity for Judge Pearson's declaration for a mistrial? As we now return to our deferred narration of the jury's problems in this case, it is important to keep in mind the controlling standard of

2

appellate review. In <u>State v. Fennell</u>, 431 Md. 500, 516, 66 A.3d 630 (2013), the Court of Appeals was clear.

> <u>The decision to declare a mistrial is an exercise of the trial judge's discretion and is entitled to great deference by a reviewing court</u>. A genuinely deadlocked jury is considered the prototypical example of a manifest necessity for a mistrial.

(Emphasis supplied.) See also <u>Simmons v. State</u>, 436 Md. 202, 212, 81 A.3d 383 (2013).

## Manifest Necessity In This Case

The jury is this case retired to begin its deliberations on April 4, 2019 at 10:14 a.m. The jury immediately revealed itself to be a very communicative one. At 11:20 a.m., it submitted the question, "Can a person be guilty even if that person was not the shooter, did not shoot the murdered person?" Judge Pearson directed the jury to refer to the written jury instructions, of which it had been given a copy.

At 1:39 p.m., the jury sent the very promising news that, "We are very close to a decision." The note included the question: "Please provide detailed guidance on why the defense and prosecution can ask how we voted if we have to return a unanimous decision?" The jurors were somehow troubled about having to commit themselves. Judge Pearson provided a written response to that query.

The first sign of more significant trouble appeared at 3:07 p.m. A jury note suggested that the jury as a whole might be having a problem with one individual juror.

> What can we do <u>if one person does not comprehend the verdict sheet or the binding nature of the instructions</u>?

(Emphasis supplied.)

3

At that point, Judge Pearson decided to give the jury the <u>Allen</u> charge. He did so over the State's objection. He firmly added, moreover, "I am only giving this one time." He then charged the jury.

> THE COURT: In light of the most recent communication from the jury I have one additional instruction that I would like to read to you. <u>The verdict must be the considered judgment of each of you</u>. In order to reach a verdict, all of you must agree. In other words, <u>your verdict must be unanimous</u>. You must consider and consult with one another and deliberate with a view to reaching an agreement if you can do so without violence to your individual judgment. Each of you must decide this case for yourself but do so only after an impartial consideration of the evidence with your fellow jurors. During deliberations, do not hesitate to re-examine your own views. You should change your opinion if convinced you are wrong but <u>do not surrender your honest belief as to the weight or effect of the evidence only because of the opinion of your fellow jurors or for the mere purpose of reaching a verdict</u>. And with this additional instruction along with the other instructions that I have already given you in writing, I am going to ask that you review all of it, and you continue with your deliberations. Thank you.

(Emphasis supplied.)

At 3:50 p.m., the jury submitted another question, "Please define first-degree felony murder." Judge Pearson again referred the jury to the written jury instruction. The first sense of significant trouble arose at 5:33 p.m. The court received a note from an individual juror asking the following:

> Can I speak with you about our decision on the verdict because one of the jurors has admitted to all the jurors of a past verdict she made on another trial with a not guilty verdict. Then found out later her decision was a mistake.

The court did not respond to that inquiry at that time. The jury was released for the day at 5:44 p.m.

4

## A Dysfunctional Jury

Before the jury reconvened on the morning of April 5, 2019, Judge Pearson had received two ex parte communications from Juror No. 25. When the whole jury reconvened, the judge explained:

> Over the course of the evening break, the Court received a voicemail message from Juror No. 25 expressing that Juror No. 25 wanted to speak to the Court about 'some things' that were going on during deliberations. This morning the Court has received another note directly from Juror No. 25 identifying eight separate issues that that juror would like the Court to address.

(Emphasis supplied.)

While the rest of the jury remained in the jury room, Juror No. 25 was brought into the courtroom and questioned by Judge Pearson. Juror No. 25's complaint indicated that the jury was split 11-1, with Juror No. 25 apparently as the lone juror holding out for a conviction. The juror complained, "I felt that at one time all 11 of them were coming at me." That juror also pointed out that information that had never been introduced into evidence had been referred to and argued in the course of the jury deliberations. That information was that the appellant's grandmother had "put her house up to get a lawyer" for the appellant. The purpose for that information ostensibly was to indicate how strongly the grandmother believed in the appellant's innocence. Juror No. 25 also indicated that she "felt threatened" when another juror wanted to "demonstrate" how a key disputed act in the evidence did or did not occur. The proposed demonstration referred to the disputed issue of whether the appellant had hit the victim in the head with a gun. Juror No. 25 had told the other juror, "Don't demonstrate nothing on me."

Juror No. 25 stated that she was "feeling bullied by the jury… to think in line with them. I am constantly being asked why I can't understand the law as they see it." She added, "They was reading it out loud," apparently referring to the jury instructions.  Juror No. 25 explained that at one point, Juror No. 43 was attempting to persuade her to compromise when Juror No. 25 got up and moved from the conference table to "over against the wall" where she put her feet up and closed her eyes. Judge Pearson sought an explanation.

> THE COURT: So, <u>are you saying that at one point during the proceedings you refused to continue to deliberate</u>?
>
> JUROR NO. 25: <u>No. I was deliberating</u>, but every time I say something <u>I was attacked</u>. "<u>You don't understand the law. You don't understand what you're reading. Let me read it to you. Maybe you just have an issue today about understanding stuff</u>."

(Emphasis supplied.)

The inquiry went on.

> THE COURT: <u>So are you saying that at some point yesterday you stopped deliberating</u>?
>
> JUROR NO. 25: <u>Yeah. They did, too</u>. They was talking about what they going to do whenever when they got ready. And then one -- the lady with the bald head with the glasses -- don't know what her number is -- she started talking about something else, <u>and then 43 went back, "Well, maybe if I read it out loud, maybe she can understand what I'm reading</u>."

(Emphasis supplied.)

The Assistant State's Attorney finally asked Juror No. 25 whether she believed she could render a fair and impartial verdict. Her final position was that she did not believe that further deliberations could produce a unanimous jury verdict.

THE STATE: <u>Can you be fair and impartial in evaluating the evidence</u> regardless of the fact that you've heard potentially, regardless of whether it's true, that the Defendant's grandmother put up money for his defense?

THE COURT: I'm sorry. What was your response?

JUROR NO. 25: <u>Yes</u>.

THE COURT: <u>That you can</u> ignore the speculation about payment of the defense attorney and <u>make a decision solely on the evidence presented and nothing else</u>.

JUROR NO. 25: <u>I don't know. I'm going to be honest with you now. I really don't know.</u>

THE COURT: <u>You earlier indicated that you did not believe that further deliberations could produce a unanimous verdict. Is that your position as to every count?</u>

JUROR NO. 25: <u>Yes</u>.

(Emphasis supplied.)

Even if at one point, she said that she could be "fair and impartial," she definitely did not believe that the jury could reach a unanimous verdict. When the State then proposed that Juror No. 43 be questioned about the information that she had passed on to the jury notwithstanding the fact that it had not been introduced into evidence, Judge Pearson gave an initial insight into the court's thinking.

THE COURT: However <u>in the macro, big-picture level, it's been indicated by Juror No. 25 that she does not believe further deliberations are likely to yield a unanimous verdict as to any count</u>. She also indicated that at some point during deliberations yesterday she shut down completely. <u>She also indicated that she felt bullied and physically threatened and uncomfortable during the course of the deliberations. I found her perceptions to be credible.</u> I'm not saying that that's the culture that's developed in there, but she genuinely believes – <u>the Court believes she genuinely believes those things</u>.

(Emphasis supplied.)

7

## The Declaration Of Mistrial

In the last analysis, Judge Pearson concluded that there was a manifest necessity to declare a mistrial.

> THE COURT: All right. Thank you for your time and patience this morning. Certainly, we've had a series of unique and fairly complicated legal issues that have arisen during the course of last night and this morning. After a lengthy discussion of those issues, the Defense has strongly advocated for the Court to direct the jury to continue their deliberations.
>
> What's giving the Court pause specifically are the revelations by a particular juror that she can no longer be fair and impartial as a result of a myriad of things, including <u>the tenor and culture that has been developed during the course of the deliberations thus far</u>. While the Defense says that it is really his objections that's potentially being waived by his desire to proceed forward irrespective of what that juror has articulated to the Court, assuming, arguendo, that the jury was able to reach a unanimous verdict, I still don't see how we can put credence into that verdict if a juror has articulated that she cannot be fair and impartial.
>
> Let's say I was somehow to get past that hurdle. <u>We also have and the Court has good-faith belief that the jury has extensively considered matters that we all agree were inappropriate, not put into evidence, and should not be considered by them in any way, whatsoever, regarding financial issues. So those two things coupled together really leaves me to believe that this is an inappropriate and tainted jury process.</u> When I say "jury process," I'm talking about the <u>deliberations</u>. They <u>have morphed into something that there's no way that we can say a productive and appropriate verdict is going to be reached</u> when, number one, <u>we have a juror who's expressly said, I feel intimidated, uncomfortable</u>, and I cannot proceed because I cannot be fair and impartial, coupled with we know for --  I can't say for a fact, but <u>I have great credence in her articulation regarding some of the things they discussed, which was wholly inappropriate and should have never been considered by the jury in any way</u>, whatsoever. Based on those things, <u>the Court finds manifest necessity to declare a mistrial over the Defendant's objection</u>.

(Emphasis supplied.)

8

Judge Pearson concluded that this jury was terminally dysfunctional. It was clear to him, as it is clear to us, that this jury was hopelessly broken. In microscopically examining the court's interrogation of Juror No. 25, however, the appellant makes the mistake of looking at the inquiry in microcosm rather than in macrocosm. In obsessing over the fact that Judge Pearson may, at one point, have misspoken himself, the appellant overlooks the overriding bigger picture.

### Fairness And Impartiality Do Not Guarantee Unanimity

To be sure, the judge may have misapprehended Juror No. 25's response as to her ability to be fair and impartial, but perhaps he did not. When the Assistant State Attorney asked the question, Juror No. 25 said, "Yes." She could be fair and impartial. When the judge asked if that was the fact, however, the juror's words were, "I don't know. I'm going to be honest with you now. I really don't know." You could easily read this total response as not being an ironclad certainty in one direction or the other.

In any event, the overriding question was whether the jury could reach a unanimous verdict. On that issue, Juror No. 25 said unequivocally that she "did not believe that further deliberation could produce a unanimous verdict." With respect to being fair and impartial, inferentially what Juror No. 25 was saying was, "Of course, I can be fair and impartial. I have consistently been fair and impartial from the very beginning. It is those 11 other jurors who cannot be fair and impartial and they refuse to respect my right to my fair and impartial judgment just because they do not agree with it." Two "fair and impartial" jury conclusions may honestly disagree with each other. Fairness and impartiality do not guarantee unanimity. Juror No. 25 may well have been implying that it was her steadfast resolve to

9

remain fair and impartial that guaranteed that there would never be a unanimous verdict. She would never surrender to an unfair and partial result, even for the sake of unanimity.

This juror, while steadfastly holding out for her own belief, felt threatened and intimidated by 11 others who disagreed with her. Judge Pearson found that her fears in this regard were genuine and sincere. Had deliberation resumed, the likelihood is not that Juror No. 25 would have been persuaded to agree with the 11 others. The risk, rather, was that she might have been intimidated into a coerced unanimity. That is not a result that anyone should have sought. That would be a result more grievous than a mistrial.

### A Treacherous Alternative

A suggested alternative to a mistrial argued for by the appellant was that Judge Pearson should have proposed to the parties the possibility that they could agree to disqualify Juror No. 25 and agree to a verdict by the other 11 jurors. That proposal flies against every principle embodied in the concept of unanimous verdicts. Jurors are encouraged to stick with their honestly held beliefs even at the cost of deadlocking a jury. In this case, the disqualified juror would have been the lone holdout for a conviction. The State would have been denied a fair trial. One can only imagine the legitimate uproar if the disqualified juror had been the lone juror holding out for an acquittal. To achieve unanimity by disqualifying the holdout juror? The very Magna Charta would be in jeopardy.

In suggesting that Judge Pearson had alternatives to the mistrial that he might have explored, the appellant ignores the Supreme Court's wisdom in Blueford v. Arkansas, 566 U.S. 599, 609, 132 S.Ct. 2044, 182 L.Ed.2d 936 (2012), in pointing out that it has "never required a trial court, before declaring a mistrial because of a hung jury, to consider any

particular means of breaking the impasse." See also <u>State v. Fennell</u>, 431 Md. 500, 517, 66 A.3d 630 (2013).

In the last analysis, Judge Pearson, after a thorough examination of the circumstances, came to the conclusion that the jury was hopelessly deadlocked. His decision that there was a manifest necessity to declare a mistrial was a decision entrusted to his discretion. As we review his exercise of discretion, we bear in mind the words of Chief Judge Wilner for this Court in <u>North v. North</u>, 102 Md.App. 1, 14, 648 A.2d 1025 (1994):

> There is a certain commonality in all of these definitions, to the extent that they express the notion that <u>a ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling.</u> <u>The decision</u> under consideration <u>has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable</u>.

(Emphasis supplied.)

We do not find that Judge Pearson's decision in this case was "beyond the fringe of what [this Court] deems minimally acceptable." We hold that he did not abuse his discretion.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY THE APPELLANT.**