701 A.2d 1153

**Robert G. BOSWELL**

v.

**Kimberly BOSWELL.**

**No. 1466, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Oct. 29, 1997.

Reconsideration Denied Dec. 5, 1997.

2

4

Nancy Polikoff, Washington, DC (Beatrice Dohrn, New York City, and Andrea Colender, Annapolis, on the brief), for Appellant.

Cynthia E. Young, Annapolis, for Appellee.

Argued before DAVIS and SONNER, JJ., and PAUL E. ALPERT, Judge (retired), Specially Assigned.

DAVIS, Judge.

On October 5, 1994, appellee Kimberly Boswell filed a Complaint for Limited Divorce (Complaint) from her husband, appellant Robert Boswell, in the Circuit Court for Anne Arundel County. She requested, *inter alia*, sole custody of their two young children (Ryan and Amanda), alimony and child support, *pendente lite* and permanently, use and possession of the family home, and reasonable counsel fees and costs. At the time of the hearing, Ryan was eight years old and Amanda was one month shy of her fifth birthday. On January 20, 1995, the circuit court ordered that the children remain with appellee; appellant was granted visitation each Wednesday and every other weekend, pending a later order. The court also imposed a moratorium on the sale of any marital property. On February 2, 1995, the parties were ordered to meet with the Maryland Department of Social Services (DSS), and the DSS was instructed to report to the court on custody and visitation.

Appellant answered the Complaint and, in July 1995, filed a Countercomplaint for Absolute Divorce, alleging adultery and requesting joint custody of the children, as well as an order directing appellee to obtain full-time employment and contribute to the mortgage and other expenses. Appellee amended her original Complaint in August 1995, requesting an Absolute Divorce and stating that she had to leave the marital home when appellant informed her that he was a homosexual. She reiterated her requests for relief stated in the original Complaint. Appellant filed an Answer to the Amended Complaint, reiterating the relief requested in his Countercomplaint.

In November 1995, the DSS filed its report with the circuit court. On December 12, 1995, the court signed a Pre-trial Order that listed grounds for divorce, custody, visitation, child

support, and a monetary award as uncontested issues.[1]  The only contested issues listed were alimony and counsel fees. The Order projected a one-day trial.  Nevertheless, the parties never reached a final agreement before trial, which occurred on March 12, 13, and 14, and April 1 and 5, 1996.  On April 5, the parties agreed on financial issues pertaining to the divorce, later incorporated in the Judgment of Absolute Divorce (Judgment).  Most financial aspects of the Judgment are not at issue in this appeal, and we will not delve into them.

After a chambers conference during trial, counsel for appellant asked the presiding judge, Judge Lawrence Rushworth, to recuse himself because of comments during the conference that appellant thought indicated a predisposition toward requiring appellant's live-in partner, Robert Donathan, to leave the home permanently, or at least not be present when the children were visiting their father.  Appellant claimed that these comments demonstrated undue prejudice toward his case.  Judge Rushworth denied the motion.

The circuit court did not issue a written opinion.  In an oral opinion announced from the bench on April 5, 1996, the court awarded sole custody to appellee, with daytime visitation rights to appellant every other weekend and on Wednesdays. Although not requested by appellee, the court prohibited overnight visitation.  The court also prohibited visitation with the children in the presence of Donathan or "anyone having homosexual tendencies or such persuasions, male or female, or with anyone that the father may be living with in a non-marital relationship."  The court also, *inter alia*, ordered appellant to obtain medical insurance for Ryan and Amanda and thereafter to pay any of their uncovered medical bills.  On August 22, 1996, at the second request of counsel for appellant, Judge Rushworth recused himself from the case.

Appellant appealed the Order, ordering and filing a transcript of the trial under MD.RULE 8–411 and 8–412.  The

---

1.  The Pre-trial Order also listed "Use & possession of _____" as an uncontested issue, but the Order fails to specify the subject of the use and possession.  We assume the court meant the marital home.

record was filed on November 25, 1996. Appellant filed a brief on January 6, 1997. On January 13, appellee's attorney for this appeal, Cynthia Young, entered her appearance. After discovering that a small portion of the record of the proceedings on April 5, 1996 was not transcribed and transmitted to this Court, appellant filed a Motion to Correct the Record under RULE 8–414 on February 5, 1997. He also asked permission to file a new brief. On February 12, 1997, appellee filed a Motion to Dismiss under Rule 8–603.[2]

After receiving the submissions, a panel of this Court dismissed the appeal on March 18, 1997. On Motion for Reconsideration filed by appellant, the Court vacated its dismissal on April 23, 1997, reinstating the appeal *pro tempore* and leaving it to the appellate panel to decide whether to dismiss the appeal. The Court's order did not address appellant's request to file a new brief, but said that appellee's brief would be due on June 2, 1997. Appellee filed her brief on June 18, 1997, and appellant filed her reply brief on July 17, 1997.[3]

Appellant presents two questions for our review and appellee presents one. We restate all three questions as follows:

I. Should we grant appellee's Motion to Dismiss?

II. Did the court abuse its discretion in setting forth its restrictions on appellant's visitation with his children?

III. Did the court err by failing to detail on the record its reasons for deviating from the Maryland Child Support Guidelines and ordering appellant to pay all of the children's unreimbursed medical expenses?

We answer the first question in the negative, denying appellee's Motion to Dismiss. We answer the second and third questions in the affirmative.

---

**2.** On January 31, 1997, appellee filed a pleading entitled "Opposition to Advancement of Oral Argument or Other Relief to Appellant." In it, appellee requested dismissal.

**3.** The record does not indicate why appellee filed her brief late, but appellant, by his silence, has waived any objection to the late filing.

# 8

## INTRODUCTION

Their names are Ryan and Amanda. They are the minor children of the protagonists in the instant case. What is in their best interest is our singular focus and our only concern in determining the propriety of restrictions imposed on visitation privileges. Much like the prolific batter engaged in our national sports pastime, we must (and we believe that counsel would be well served if they would) keep our eyes on the ball.

Bombarded by platitudes from both sides, we are told by appellant that, relevant to our decision herein is the fact, *inter alia*, that "the mental health literature demonstrates that children with gay and lesbian parents are as happy and healthy as other children and are not adversely affected by their parents' sexual orientation." Because of the manner in which the parties have sought to buttress their respective positions and because there has been an attempt to cast the issues in this case in more universal terms than is warranted, we are constrained, at the outset, to delimit the parameters of our review in this appeal.

This is not a case about gay and lesbian rights, nor do we break new ground, in our ultimate holding, *infra*, that the evidence must support a factual determination of adverse impact on the children to sustain restrictions on visitation. Concomitant with and undoubtedly influenced by societal norms and mores, Maryland law traditionally entertained a presumption that children exposed to the adulterous partners of their parents were harmed by such exposure. The notion that exposure to an adulterous relationship, *ipso facto*, constituted a sufficient basis for a finding that a parent was unfit was laid to rest by the Court of Appeals in *Davis v. Davis*, 280 Md. 119, 372 A.2d 231 (1977). Consonant with the Court's decision in *Davis*, this Court in *Swain v. Swain*, 43 Md.App. 622, 406 A.2d 680 (1979) (custody determination of adulterous parent) and *North v. North*, 102 Md.App. 1, 648 A.2d 1025 (1994) (determination of overnight visitation by homosexual parent), reiterated that exposure to the parent's adultery or

sexual orientation may be considered only insofar as the minor child is actually harmed thereby.

Simply put, while we shall review the factual findings as well as the evidence supporting the decision to impose restrictions on visitation in this case, this review is only toward the end of deciding, consistent with the proper standard of appellate review, whether such restrictions are in the best interests of the children in this case. Because there is no longer any presumption of unfitness in Maryland, all such cases are fact specific. Consequently, the exhaustive compendium of articles and treatises, submitted by appellant, chronicling studies which conclude that approximately six million children are raised in same-sex households and "not a single study has found children of gay or lesbian parents to be disadvantaged in any significant respect" are immaterial to our narrowly focused consideration of whether the evidence supports a finding that Ryan and Amanda are adversely affected by such exposure. In other words, assuming, *arguendo*, that the trial judge had been presented evidence at trial that actual harm causally connected to the sexual orientation of appellant had been suffered by the Boswell children, we would uphold any reasonable restriction imposed on visitation designed to prevent the demonstrated adverse effect even if there had also been presented at trial conclusive evidence that not one of the six million children in same-sex households that were studied had been adversely affected by a parent's sexual orientation.

Appellee, for her part, chooses to thrust and parry. We observe, however, as we did at oral argument before us, that we recognize counsel's right and obligation, within ethical bounds, to vigorously advocate on her client's behalf. This includes invoking all available procedural rules in advancing her client's cause. While we acknowledge counsel's motion to dismiss this appeal is not technically frivolous, we believe, as we so indicated at oral argument, that reaching the merits concerning promotion of the welfare of the two children involved should, in this particular case, take precedence over procedure.

At oral argument, appellant alluded to comments which, according to appellate counsel, were made by the trial judge in chambers without the benefit of the court reporter. These remarks, reflected, according to the assertions set forth by counsel for appellant in her brief (referring to the prohibition in the court Order against visitation in the presence of "anyone having homosexual tendencies"), "biased preconceptions rather than the best interests of the children...." We shall review the propriety of the wording of the Order, *infra;* however, we are constrained to note that the language of the Order speaks for itself and we are not here concerned with the question of judicial bias. Bias itself, independent of the language of the Order, has not been asserted as a ground for appellate relief.

We note that a Motion to Recuse was made and was granted and, thus, the trial judge will have no further involvement in these proceedings. Accordingly, we stress that our inquiry is limited to the propriety and reasonableness of the Order and not to the motives of the trial judge. We intimate no view as to the propriety of the trial judge's conduct of the proceedings because, as we said in *Braxton v. Faber,* 91 Md.App. 391, 398–409, 604 A.2d 543 (1992), appellate review of the proceedings over which a judge presides considers judicial misconduct only as it impinges upon the rights of the parties. Alleged judicial misconduct or bias is reserved for another day and is not properly before us in this appeal, since the trial judge is afforded no opportunity to refute or explain the genesis of the objectionable language, nor are his motives pertinent to a determination of whether the language in the Order [4] was proper. *Id.*

---

4. Although trial counsel for appellee, Herbert Luntz, drafted the Order in question, counsel for appellant, Charlene M. Dunn, wrote to Judge Rushworth on April 26, 1996, stating that Mr. Luntz's

"wording in this section places [appellant] in a position of asking the sexual preference of anyone having contact with the children. After many discussions, Mr. Luntz refuses to budge on his wording.

I have never before been in a position of refusing to approve a proposed Order. I asked Mr. Luntz today if he would present my

Having disabused the parties of the belief that the above matters are germane to our decision in this case, we hold that, in the case *sub judice*, the restriction prohibiting "visitation of the children with the father in the presence of Mr. Robert Donathan or anyone having homosexual tendencies or such persuasions, male or female, or anyone that the father may be living with in a non marital relationship" is unreasonable on its face. As will be discussed in greater detail below, the prohibition against "anyone having homosexual tendencies or such persuasions" would require inquiry of the sexual orientation of every person with whom the children might come in contact, for instance, at a shopping mall or on a casual outing or picnic and would not necessarily be within appellant's control.

We further hold that, although the fact-finding of the lower court was flawed, a review of the evidence ultimately indicates the principal concerns expressed by the expert witnesses for the children dealt with adjustments that all children must make upon a separation of their parents, irrespective of the assimilation of any new mate into the daily routine of one of the parents. Therefore, the evidence was insufficient in that manifest from the record before us is no actual harm, i.e., detriment to health, poor academic performance, emotional trauma, shown to be caused by exposure to appellant's sexual orientation. Pursuant to our analysis below, we vacate the judgment of the circuit court and remand the case for further proceedings consistent with our holding in Part III *infra* and for passage of a proper order consistent with this opinion.

## FACTS

From the procedural quagmire of this case, the following facts emerge. Appellant and appellee were apparently happily married until appellant told appellee in August 1994 that he was homosexual. There was also trial testimony that appellee had an affair around this time; specifically, appellee stated

---

written concerns to you when he brought the Order to you for signature. Since he refused to do so I am writing directly to you to explain my concerns."

that after her husband's revelation, she became intoxicated with a male acquaintance and had sex with him. The couple separated in August.

In February 1995, after divorce proceedings had begun, Donathan began living with appellant. Visitation as ordered by the circuit court on January 20, 1995 occurred with Donathan present and living with appellant. At trial, appellant testified that at first, he and Donathan slept in the same bedroom when the children came for visitation. When court proceedings revealed that this was upsetting Ryan, appellant testified that he and Donathan began sleeping in separate bedrooms during visitation. Appellant testified that he and Donathan agreed that Donathan would not take an active role in the discipline of the children, and the trial testimony indicated that Donathan generally abided by this arrangement. Donathan would play with the children during visitation and participated in activities with appellant and the children during visitation.

Marcia Kabriel was the social worker appointed by the court to investigate the situation and to make a recommendation on custody and visitation. She testified that she conducted over twenty interviews with the parties involved by the time she filed her report on October 30, 1995, and the children had bonded well with both parents. Although she recommended that the primary residence of the children remain with appellee, she recommended liberal visitation with appellant. She also recommended that neither parent include others or their grandparents in the children's extracurricular activities for at least a year, that neither parent interfere with the children's participation in all family functions of both sides of the family, that the parents alternate visitation on major holidays, that appellant have a week with the children each of the summer months, and that the children stay with appellant every other weekend and have time with appellant on Wednesday evenings.

At the time of her initial recommendations, Kabriel did not recommend overnight visitation on Wednesdays. Later, be-

cause the acrimonious relationship between appellant and appellee was not improving, Kabriel concluded that "it was important for the children to have a—a time to see their father in between the two-week period, that that was a long period of time [to go without seeing him]." Thus, she recommended that the children stay with their father overnight on Wednesdays.

Kabriel indicated that the children were "confused" by the relationship between their father and Donathan, and that while Amanda was adjusting fairly well to the situation, Ryan was having difficulty accepting it. When pressed by counsel for appellee to clarify whether the cause of the confusion was the homosexual aspect of the relationship between appellant and Donathan, however, Kabriel replied:

> The children would have been confused if it had been a man or a woman. The children routinely in the first year or two after a separation and divorce have hopes that their parents will reconcile. They want them together and so the whole situation would be confusing to them.

Kabriel perceived no indications that appellant and Donathan engaged in sexual activity in front of the children. She did recount Ryan's complaint that Donathan had once "grabbed his arm" when he was running, and that his father would at first lock his bedroom door at night so that Ryan could not go to him if he was frightened.

When asked whether it would be better for the children if Donathan were absent whenever they visited appellant, Kabriel replied:

> Well, most certainly as I expressed to both of the parents, ah, it made things much more difficult with the children in the initial separation and break up and unfortunately, ah, as Doctor Standley expressed to me about it, their treatment was very slow. I think that if the parents could begin to work together and communicate and plan for these children and reduce the tension between—that exists between the parents, this makes more sense in terms of [Donathan] has been in these children's lives now for over a year and I don't

think that he's just going to go away. So in a sense the children have already had their experience with him and have a relationship with him.

Dr. Kay Standley, a child psychologist with whom the children were in therapy, testified as an expert witness for appellee. She had begun seeing Ryan in January 1995 and Amanda in April 1995, both on a weekly basis, and she was still seeing them at the time of trial. Standley testified that Amanda's problems were related to the animosity between appellant and appellee and that Ryan's "period of adjustment" was more difficult because he suffers from Attention Deficit Disorder, has a "pretty poor self-concept," and has difficulties with peer relationships.

When asked whether the temporary visitation schedule was working, Standley testified that the weekend visits had become more pleasant and that the children did not seem as distressed as they once were. Standley said, however, that overnight visitation on Wednesday evening would detract from the consistency and stability she felt the children needed, and she recommended that there be no overnight visitation "during the week" because of the disruption it would cause. She maintained that mid-week visits should continue, however.

When asked about the effect appellant's homosexual relationship with Donathan was having on the children, Standley testified that Ryan was "distressed by the relationship between his father and his friend. One time in particular he was concerned that they slept together face to face and he didn't understand that." When asked whether it would be better for the children if Donathan were not present during visitation, Standley focused her answer on the effect any relationship of appellant's, whether homosexual or heterosexual, would have on the children:

In any situation like this as the children adjust to a parental separation, divorce and the realignment of parents with new partners, it's very, very important whether that is the same sex or an opposite sex partner that there be a very slow

period of exposure to the—to the children of that—that new partner. That should proceed deliberately and very slowly.

In this instance I think it's complicated somewhat because, for especially Ryan, Amanda doesn't seem to be—she seems to be more flexible about this but for Ryan especially, he seems to be having difficulty adjusting to the presence of his father's friend all the time. They—children in a situation like this really need to be reassured that they have the affection and the continuing relationship of each parent . . . and that—that no other person, no other relationship will—will interfere with that.

Standley had this to say about the children's adjustment to their father's relationship with Donathan:

I think initially [their father's new relationship] was very difficult for them. I think they're doing a little bit better now. I think they're getting used to it. I think it was very unfortunate initially, how quickly that they were exposed to all that but they seem to be adjusting a little bit better now.

Standley did venture that Donathan's disappearance from visitation would not be "much of an issue" for the children, and may even be a relief.

Appellee testified to many financial and personal circumstances surrounding the separation and divorce proceedings. Regarding circumstances relevant to this appeal—i.e., visitation—appellee testified that appellant told her one night shortly before the separation that he was homosexual and had been having an affair with a man named Jeff Hancock. The next day, appellee said, she met with a female friend and later got drunk and had sex with a male acquaintance in his truck. She never saw this person with whom she had sex again.

When asked her preference on visitation between appellant and the children, appellee stated unequivocally that appellant should have visitation rights every other weekend and midweek every week. She agreed with Kabriel's recommendation that appellant take the children for one week per month during the summer months, but expressed a wish that there

be no visits in August and that the summer visits not be scheduled for consecutive weeks.

Appellant testified that both children held good feelings toward Donathan and that Donathan enjoyed friendly and pleasant relations with them. When notified by his son's school of a report that he or Donathan had sexually abused one of the children, appellant arranged for an investigation by the police department. The investigating officer, Elizabeth Parsons, testified that, based on an investigation that included interviews with all parties involved, there was no evidence that any abuse had occurred. On April 4, 1996, three weeks into the trial, appellant testified that, since he had learned that Ryan was upset by appellant and Donathan sleeping in the same room, he had arranged for the two of them to sleep in separate bedrooms. He stated his willingness to continue with this arrangement. When asked about an allegation that Donathan had abused Ryan, appellant replied that he had once asked Donathan to stop Ryan from running and throwing objects off of a balcony until appellant came upstairs. Apparently, Donathan grabbed Ryan's arm to restrain him.

Before trial, the judge held videotaped, *in camera* interviews with each of the children. They each indicated that they preferred to live with their mother. Concerning overnight visitation, the following colloquy occurred:

THE COURT: When you go to visit your father and it's overnight, are you concerned? Does anything happen that frightens you or anything of the sort?

RYAN: In the daytime once when I was rollerblading, my dad's friend pulled me down and hit my knee very bad.[5]

Ryan told the judge that Donathan "grabs my arms a lot." When the judge asked the children whether either of them had seen "Mr. Rob" in the shower, they answered that they had not. In its Order setting visitation, the court would later depend heavily on the following colloquy:

---

5. The court stated its belief that it "didn't believe that [this treatment] amounted to a great deal...."

RYAN: My dad says that we were going—when we moved into our new house, there was going to be three beds, but there's—I mean, four beds, but there's only three, and dad and Mr. Rob sleep in the same bed.[6]

THE COURT: So you prefer that there be more beds for your dad to—

RYAN: One more bed.

THE COURT: What? One more bed?

RYAN: One more bed, and they would move from his office, downstairs.

THE COURT: Uh-huh. So when you go to visit then, would you prefer not to have overnight visitation?

RYAN: I don't like sleeping over there. Maybe my dad could pick me up early each weekend and the only thing different would be that I wouldn't spend the night. He would pick me up. I would go to my mom's—(Inaudible).

THE COURT: Well, you tell me then. Would you prefer that, not to have overnight?

RYAN: (No response.)

THE COURT: And Amanda, have you been over there overnight as well?

AMANDA: Uh-huh.

THE COURT: And how do you feel about that?

AMANDA: I don't know.

THE COURT: Would you prefer visitation where Mr. Rob is not there?

AMANDA: Uh-huh.

RYAN: (No audible response.)

THE COURT: Both indicating that. Amanda, would you prefer visitation when Mr. Rob is not there? To go visit when Mr. Rob isn't there and only your dad?

AMANDA: I just want to visit my dad. Not Mr. Rob. Only sometimes I want to visit Mr. Rob.

---

**6.** Apparently, it was this comment that prompted the change in sleeping arrangements at appellant's home during visitation periods.

THE COURT: Sometimes you want to visit him? So you get along with Mr. Rob?

AMANDA: Uh-huh.

RYAN: She does. I don't.

THE COURT: Okay. But, Ryan, you're certain about that? You would rather not visit with your dad when Mr. Rob is there? Is that—

RYAN: Yeah, but I don't want him to move away, because he has a dog and I really like the dog.

THE COURT: Okay.

The court made the following findings on the record after its conversation with Ryan and Amanda:

The Court has had the opportunity to, on the record, speak with the minor children, Ryan and Amanda. The gist of that conversation would indicate to the Court that they are both intelligent children, had no difficulty in speaking with the Court and voicing their opinions. Obviously, Ryan, the older child, was able to articulate to a better extent. His feelings are that he would prefer visitation with his father without the presence of Mr. Rob, and he would be willing to, he said, get up early and start the day early and stay later if the visitation were not overnight.

He had indicated some concern that he was promised apparently by his father living accommodations which would amount to three bedrooms, and apparently one of those rooms is used as an office, and Mr. Rob and his father use the same bed. This is what he said in any case.

He is concerned about being with Mr. Rob, related an incident of some pushing or scolding by Mr. Rob. I didn't believe—the Court didn't believe it amounted to a great deal, but he showed some concern about that.

On the other hand, he indicates to us, as does Amanda, that Mr. Rob apparently has a dog, so he doesn't wish to offend Mr. Rob and wishes to continue visitation with the dog. I don't know how we can effect that.

Amanda pretty much mimics what her brother had indicated. The closest she comes to any visitation with her father in the presence of Mr. Rob is that she said that she would prefer just to visit with her father, but, then again, she followed it up with a statement that she would also like to on occasion visit Mr. Rob.

So the Court will factor in that conversation, which again, Counsel, is on the record, as it's required to be, there being no waiver. . . .

Also testifying in relation to Donathan's presence during visitation were Officer Elizabeth Parsons, who testified that she found no evidence supporting allegations of child abuse by appellant or Donathan, and Officer Keith Bauman, an Anne Arundel County police officer, who testified that he had known appellant for several years and would feel comfortable leaving his eight-year-old daughter alone in the company of appellant and Donathan.

As noted *supra,* appellant filed his initial brief and transcripts without filing a transcript of the proceedings that occurred on the morning of April 5, 1996. It is undisputed that this failure was due to an oversight of the Court Reporter who ordered the transcripts from Gore Reporting Company at appellant's request. At the time of the filing of the initial brief, appellant had at his disposal the transcript of the proceedings in which the judge orally ruled on visitation. The court made no findings of fact in the comments from the bench of which appellant had transcripts at the time of his filing, and the principal argument in appellant's brief was that the failure of the court to make any findings of fact upon which to base its visitation Order mandated reversal under our opinion in *North,* 102 Md.App. 1, 648 A.2d 1025.

In the portion of the hearing that initially went untranscribed (an error since corrected), the court made these comments from the bench concerning visitation:

Visitation is an interesting question and without addressing or surmising, assuming, that there is any relationship other than the—I think what's been testified to, the affection

between [appellant] and Mr. Donaldson [sic], presently residing together, the Court treats this as it would, at least initially, as it would treat any relationship and there are many of them. I have ruled on this time and time again and been affirmed at least by the Special Court, that where there is a situation with minor children and where there is a—a paramour involved, the Court most often addressing it where there is a third party to the triangle who is ... usually of the opposite sex, the party to receive that visitation, and where that party is present. I have often, time and time again, restricted visitation. I think that's only appropriate. Certainly where we have a situation where the husband should run off with a female companion with some relationship of that nature which certainly in the female we—where up to this time we have thought in terms of an adulteress and where the relationship continues, an inappropriate relationship. It is certainly inappropriate to do something other than restrict the relationship.

So the Court is concerned. It has considered the testimony of the expert witnesses and Ms. Kabriel the Court has—has been in front of the Court on numerous times. Uh, but—and has considered the testimony of Dr. Kay Standley who suggests that overnights are not appropriate. So under those circumstances the Court would restrict the visitation to be no overnight.... Certainly the—there is no reason to address any visitation of the children with Mr. Donaldson[sic]. That visitation seems to be, if it is desired at all by them, seems to be predicated on the fact that the dog is present. I would hope not to restrict any visitation with the dog but if it becomes necessary to—if that has to be coupled by Mr. Donaldson [sic] or anyone else in—in a relationship, ongoing relationship of that type, then certainly it goes to the—the well-being of the children and the concern that the children has [sic] in their interest, *Carter v. Carter.* So the visitation on Wednesday seems to be agreeable. Even though it is a—it is an arrangement which may well interfere with the—eventually interfere with schooling, et cetera, and the activities of these children, the Court

deems that if it must get specific, then—then I'll do so in holding down the—the visitations of both the weekend and Wednesday and restricting during this period any overnight visitation. Clearly the Court is convinced that the, uh, that there is a relationship, at least up until this time, and no concern to change before this time, that the Defendant is sleeping with—with another person without the cloak of a marital relationship.

The—the Court notes that—that the home has four bedrooms. I think that was the testimony, or at least three bedrooms. And so if the visitation to take out of that particular environment is—if it's necessary to visit outside of the home or enter into a new home where the Defendant is concerned, so be it. That will have to be adjusted for the benefit of the children. I would hope that the parties could work out something that obviously the matter of going on from year to year and continuing until the children are of age and perhaps beyond could work out some of these matters between themselves.

After a recess for lunch, the circuit court reconvened and continued to discuss its resolution of the case. The remainder of the trial proceedings was transcribed and transmitted to this Court in a timely manner. Discussing again the Order setting visitation, the court said:

THE COURT: The weekend visitation, there will be no visitation in the home where there is—Mr. Donnelly is it?

[COUNSEL FOR APPELLANT]: Donathan.

THE COURT: Donathan. Or any other situation that goes to a relationship that isn't condoned.

[COUNSEL FOR APPELLEE]: Your Honor, would the Court set the hours or is that—

THE COURT: I'd be happy to do that. The children voiced the opinion that they would be willing to stay late on the weekends or go early on the weekends as long as they did not stay overnight. I'll accept that. Obviously

they're young children. So nine until—nine on the weekends.

\* \* \*

Obviously I'll restrict [visitation] to those hours. But the understanding is that, Mr. Boswell, there may come a time when you would elect to have someone else stay at the home with you, perhaps a female companion or another male companion, but my order is that the children are not to visit you under those circumstances. So if it means taking them to some other place, some neutral place, then that's the Order of this Court, and that's a strict order. It is clear to me that we'll have no situation where you have a live-in companion.

In its written Order filed on April 26, 1996, the court stated, in pertinent part:

**AND IT IS FURTHER ORDERED,** that the Defendant shall have the right to have the minor children of the parties with him as follows:

A. Every other Saturday, 8:00 a.m. to 8:00 p.m., Wednesday 3:00 p.m. to 8:00 p.m. on school days, and Wednesday 8:00 a.m. to 8:00 p.m. on non-school days.

B. There is to be no overnight visitation and under no circumstances is there [to] be any visitation of the children with the father in the presence of Mr. Robert Donathan or anyone having homosexual tendencies or such persuasions, male or female, or with anyone that the father may be living with in a non-marital relationship.

The court ordered appellant to pay appellee $1,203 per month in accordance with the Maryland Child Support Guidelines (Guidelines). In addition, the court ordered that appellant obtain health insurance for the children and pay all medical bills until the insurance becomes effective. The court also ordered appellant to pay any uncovered medical bills of the children after obtaining health insurance. The court gave no reasons on the record for these provisions.

## ANALYSIS

### A

We first address appellee's Motion to Dismiss. Both parties offer detailed explanations of the events that led to the exclusion of a portion of the circuit court's conclusions (the "missing portion") from the record. We shall attempt to condense their arguments as best we can. Appellee alleges that because appellant was present during the entirety of the proceedings below, we should impute his knowledge to his appellate attorneys. Appellee also refers to proceedings subsequent to the trial, presided over by Master Philip Caroom. That a portion of the trial proceedings remained untranscribed was evident from statements made during this proceeding, argues appellee, and appellant took inadequate measures to ascertain whether the Court Reporter or Gore Reporting Company had erred. Instead, argues appellee, appellant unjustifiably relied upon the oral assurance of anonymous employees of Gore Reporting Company and the Court Reporter's Office that no portion of the proceedings below went untranscribed. Finally, even if we were to accept appellant's excuses at face value, argues appellee, they allow appellant to escape the consequences of a violation of RULE 8–602(a)(5) only.[7] Appellee reminds us that our initial Order of Dismissal relied upon RULE 8–602(a)(6), which allows dismissal if the "contents of the record do not comply with Rule 8–413," but lists no exculpatory circumstances of the sort found in RULE 8–602(a)(5). Thus, appellee concludes, we must grant her Motion to Dismiss.

For his part, appellant calls our attention to the fact that, while he was present during the missing portion, his appellate attorneys were not. When notified by counsel for appellee that the circuit court had found that appellant had voluntarily

---

7. RULE 8–602(a)(5) states that the Court may dismiss an appeal because:
   (5) the record was not transmitted within the time prescribed by Rule 8–412, unless the court finds that the failure to transmit the record was caused by the act or omission of a judge, a clerk of court, the court stenographer, or the appellee....

impoverished himself, counsel for appellant telephoned both Gore Reporting Company and the Court Reporter's Office and was assured by both that no portion of the trial was untranscribed. Once his counsel discovered the error, appellant argues, appellee promptly filed a Motion to Correct the Record, after which she filed an untimely Motion to Dismiss. Appellant also attempts to lay at least part of the blame at the feet of counsel for appellee, who, appellant argues, was present during the missing portion of the proceedings and who, he alleges, purposely kept silent while helping to prepare a record extract.

█ Although both parties cite numerous cases to support their respective positions, we need not delve too deeply into the case law in order to resolve this question. The Motion to Dismiss is denied. We may dismiss an appeal on motion or on our own initiative. RULE 8–602(a). A Motion to Dismiss must be filed in this Court no later than ten days after the record was filed under RULE 8–412, if the motion is based on RULE 8–602(a)(6). RULE 8–603(a)(1). Appellee filed her motion on February 12, 1997, two and one-half months after appellant filed the deficient record. The motion was untimely, and we will deny it. *Horst v. Kraft,* 247 Md. 455, 460–461, 231 A.2d 674 (1967).

█ Appellee correctly points out, however, that we may dismiss the case on our own motion. We need not dissect RULE 8–602 in an effort to find the distinction between subsections (a)(5) and (a)(6) of that rule. We leave that task for another day. In our view, whether the excuses enumerated in RULE 8–602(a)(5) apply to subsection (a)(6) is quite beside the point. To dismiss the appeal is within our sound discretion. *E.g., Wilhelm v. Burke,* 235 Md. 412, 417, 201 A.2d 835 (1964). The Court, having vacated the Motion, left it to the present panel to decide whether to grant it. Between appellant's first Motion to Correct the Record and now, appellant has provided a transcript of the missing portion of the trial, certified as accurate by Deborah H. Powers of Gore Reporting Company. We now have before us all materials necessary to decide this

appeal, and we are satisfied that appellant worked diligently to correct the error. Appellant's Motion to Correct the Record is granted, and appellee's Motion to Dismiss the appeal is denied. Under RULE 8-414(c), we direct the Clerk of the Circuit Court for Anne Arundel County to transmit to this Court a court-certified copy of the transcript of the morning proceedings of April 5, 1996 at issue in this appeal.

■ We further note that appellant appears to have abandoned—wisely, in our opinion—his attempt to withdraw his initial brief and file a new one. To prevent any further confusion, we shall assume that the motion is still before us, and deny it. Appellee has invested considerable time and expense in her defense of this appeal, and further extensions would cause undue delay and hardship.[8] Appellee has filed her brief timely, and appellant has filed a reply brief.

■ We note that arguments may not arise for the first time in a reply brief. *Beck v. Mangels*, 100 Md.App. 144, 149, 640 A.2d 236 (1994). In his initial brief, appellant argues that the circuit court failed to make any factual findings, thus failing to satisfy the standard enunciated in *North*—that restrictions on visitation must "follow logically from the facts found by the court" and have a "reasonable relationship to [the court's] announced objective." *North*, 102 Md.App. at 14–15, 648 A.2d 1025. Obviously, the comments from the bench that were transcribed after submission of appellant's brief render ineffectual any argument that the court failed to make any findings of fact. Nevertheless, the focus of appellant's argument in his initial brief was that the court failed to satisfy the *North* standard. Appellee certainly made good use of the court's comments drawn from the missing portion of the trial, including it in her appendix and arguing that the circuit court "stated reasons for denying overnight visitation." In turn,

---

8. We note that our denial of appellant's request to file a new brief, by appellee's own admission, seems to end the matter. In her original Motion to Dismiss, appellee stated, "If Appellant were content to rely upon his present brief, Appellee would move only to correct the record and proceed." We take appellee at her word and proceed.

appellant's reply brief addresses the court's comments made in the missing portion of the trial, arguing that they failed to satisfy the *North* standard because they are clearly erroneous and because they neither announce an objective nor provide logical support for the restrictions on visitation imposed by the court. We do not think that the reply brief alters, in any material way, the argument appellant made in his initial brief regarding the visitation Order. Accordingly, we proceed to the merits of the appeal.

## B

### I

In all visitation and custody disputes, the paramount goal of the court is to safeguard the best interests of the children involved. *Taylor v. Taylor*, 306 Md. 290, 303, 508 A.2d 964 (1986); *Hixon v. Buchberger*, 306 Md. 72, 83, 507 A.2d 607 (1986); *Wolinski v. Browneller*, 115 Md.App. 285, 301, 693 A.2d 30 (1997). Regarding visitation rights for parents, we have stated that

[a] parent whose child is placed in the custody of another person has a right of access to the child at reasonable times. The right of visitation is an important, natural and legal right, although it is not an absolute right, but one which must yield to the good of the child.

*North*, 102 Md.App. at 12, 648 A.2d 1025 (quoting 2 Nelson, *Divorce*, § 15.26 (2d ed.)). As we noted in *North*, a case with similar facts, we are not dealing with a denial of all access to the children, but with a limitation on access and restrictive conditions placed on access. Thus, we must determine whether the restrictions and limitations are reasonable—whether they improperly deny appellant and the children access to one another "at reasonable times," and, it follows naturally, under reasonable conditions. *See id.*

In *Davis*, the Court of Appeals set forth the appropriate standard of review for reviewing a chancellor's custody award, and, in *North*, we adopted this standard as the proper framework for analysis of a chancellor's award of visitation rights:

When the appellate court scrutinizes factual findings, the clearly erroneous standard of [MD. RULE 8–131(c) ] applies. If it appears that the chancellor erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion.

*Davis,* 280 Md. at 125–26, 372 A.2d 231; *see also Petrini v. Petrini,* 336 Md. 453, 470, 648 A.2d 1016 (1994). We discussed in *North* the amorphous nature of the term "abuse of discretion," noting:

[Abuse of discretion] has been said to occur "where no reasonable person would take the view adopted by the [trial] court," *In re Marriage of Morse,* 240 Ill.App.3d 296, 180 Ill.Dec. 563, 571, 607 N.E.2d 632, 640 (1993) or when the court acts "without reference to any guiding rules or principles." *Long John Silver's, Inc. v. Martinez,* 850 S.W.2d 773, 775 (Tex.App.1993). It has also been said to exist when the ruling under consideration "appears to have been made on untenable grounds," *Halloran v. Town of North Canaan,* 32 Conn.App. 611, 630 A.2d 145, 147 (1993), when the ruling is "clearly against the logic and effect of facts and inferences before the court," *Shockley v. Williamson,* 594 N.E.2d 814, 815 (Ind.App.1992), when the ruling is "clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result," *Novak v. Novak,* 2 Neb.App. 21, 508 N.W.2d 283, 288 (1993), when the ruling is "violative of fact and logic," *Young v. Jangula,* 176 Mich.App. 478, 440 N.W.2d 642, 643 (1989), or when it constitutes an "untenable judicial act that defies reason and works an injustice." *Moore v. Bd. of Educ. of Fulton School,* 836 S.W.2d 943, 948 (Mo.1992).

*North,* 102 Md.App. at 13–14, 648 A.2d 1025. Our review of these varying characterizations of the abuse of discretion standard led us to this conclusion:

The decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable. That kind of distance can arise in a number of ways, among which are that the ruling either does not logically follow from the findings upon which it supposedly rests or has no reasonable relationship to its announced objective. That, we think, is included within the notion of "untenable grounds," "violative of fact and logic," and "against the logic and effect of facts and inferences before the court."

*North*, 102 Md.App. at 14, 648 A.2d 1025.

In the case *sub judice*, the Order of the circuit court, setting visitation rights for appellant, prohibited three types of visitation. First, it prohibited any overnight visitation with appellant, including extended summer visitation. Second, it prohibited visitation of the children with appellant in the presence of anyone appellant may be living with in a non-marital relationship. Third, it prohibited visitation of the children with appellant in the presence of any homosexuals. We discuss each prohibition in turn.

### i

After its interview with the children, the court noted that Ryan had indicated his preference not to stay overnight when visiting appellant. Later, the court stated that the "children voiced the opinion that they would be willing to stay late on the weekends or go early on the weekends as long as they did not stay overnight. I'll accept that. Obviously they're young children." Finally, the court had earlier stated that it had "considered the testimony of [Kabriel] ... and has considered the testimony of Dr. Kay Standley who suggests that overnights are not appropriate."

■ From our review of the record, these statements appear to constitute the only foundation expressed by the circuit court for prohibiting overnight visitation. The court made no finding of possible harm to the children from overnight visita-

tion, either from Donathan, appellant, or the general circumstances. We turn to an examination of the court's findings. We note first that two of the findings are clearly erroneous. Only Ryan expressed a desire not to stay overnight; thus, the court's belief that the "children" wished not to stay overnight was incorrect. Amanda did answer in the affirmative when asked if she preferred that Donathan not be present during visitation, but almost immediately qualified her statement by saying that sometimes she would like to visit with Donathan present, and at other times she would just like to visit her father only. We do not think these comments translate well into a preference not to stay overnight with her father.

■ A court may consider a child's wishes as a factor in determining to whom to award custody, if the child is of sufficient age and has the intelligence and discretion to exercise judgment about his or her future welfare. *Leary v. Leary*, 97 Md.App. 26, 48, 627 A.2d 30 (1993). We are not certain that even Ryan meets this criteria at eight years of age, although the court characterized him as an intelligent child. In any case, we cannot uphold the court's weighing of the wishes of the children because the court erroneously thought that both children wished not to stay with their father overnight, and presumably made its determination accordingly. We are not certain that the court would make the same prohibition if it were not under the mistaken belief that both children wished it, and we will not substitute our judgment as to the appropriate restriction, if any. We shall remand.

■ The court's second misstatement is more egregious. Standley, the child psychologist who was counseling the children, neither stated nor implied that overnight visitation on the weekend and extended summer visitation was unadvisable. Rather, she held the opinion that overnight visitation "during the week" would prove overly disruptive to the children's lives. Specifically, she stated:

My—my recommendation would be that—that there not be an overnight visit during the week but that certainly Mr. Boswell would spend some time on a Tuesday or a Wednes-

day night because—with the children, because for the children that's a very long period of time. They shouldn't go a long time without contact with both parents. But I think it's disruptive for them to—if they spend the night.

Standley's quoted remarks clearly indicate that her recommendation against overnight visitation "during the week" was made within the context of discussing arrangements for midweek visitation, not all overnight visitation. Our conclusion is buttressed by her earlier statement that although the period of adjustment to the separation was especially difficult "early on . . . the weekend visits seem to have become, in the last few weeks, more pleasant and the children don't . . . seem to be as distressed." Finally, when asked by the court if it would be better for the children if Donathan were not there when they were there, Standley answered that an adjustment to a parent's new relationship is always better handled very slowly and that, initially, because the children were exposed quickly to their father's new relationship, "it was very difficult for them." Nevertheless, she immediately indicated that the children were "getting used to it," and were "adjusting a little bit better to it now." We do not think Standley's remarks, taken individually or as a whole, lend themselves to a rational interpretation that she opposed all overnight visitation.

The court referenced the testimony of Kabriel, the social worker who prepared the report on behalf of the DSS, but did not indicate which portion of her testimony contributed to its decision to disallow overnight visitation. This alone violates *North's* requirement that the court find facts that bear a reasonable relationship to an announced objective. *North,* 102 Md.App. at 14–15, 648 A.2d 1025. Stating that it "considered" the testimony of a witness *in toto* is not fact-finding, especially when the court draws no factual conclusions from the testimony. At any rate, Kabriel had no objection to overnight visitation even though she acknowledged that appellee had voiced concern about it. In fact, Kabriel had recommended making Wednesday visitation an overnight visitation.

Finally, the court seems not to have announced any objective to be served by prohibiting overnight visitation. In other words, the court never said why overnight visitation would be harmful to the children. The closest it came was a statement to counsel that "obviously they're young children." The relevance of their ages is unclear without more. Ryan, at the time of the court's Order, had just turned eight. Amanda was about to have her fifth birthday. Neither child was, in our view, too young *as a matter of law* for overnight visitation with a parent. Moreover, none of the witnesses, expert or otherwise, testified that the children's youth makes overnight visitation harmful. Yet the court's denial of overnight visitation based on a vague comment that they are "young children" amounts to a determination that they are too young as a matter of law to stay overnight with their father or to take vacations with him.[9]

If the court had reasons other than the children's youth for prohibiting overnight visitation, it did not articulate them, and thus could not satisfy RULE 2–522(a), which impresses upon the court a duty to dictate into the record or prepare and file in the action a brief statement of the reasons for the decision. *Id.; Lemley v. Lemley*, 102 Md.App. 266, 277, 649 A.2d 1119 (1994). At the very least, this rule requires that the court articulate an objective to be served by the restriction and describe the facts that further the objective. *North*, 102 Md.App. at 14–15, 648 A.2d 1025. Thus, this portion of the court's Order cannot stand on this record.

## ii

We also must vacate that portion of the court's Order that prohibited visitation in the presence of any non-marital partner appellant may have. The court, in its oral statement of reasons for its decision, reproduced *supra*, clearly indicated that it was concerned not with the homosexual nature of the

---

9. Indeed, by the date of oral argument in this case, Ryan was almost nine and one-half years old, and Amanda was almost six and one-half years old.

relationship between appellant and Donathan, but with the status of appellant and Donathan as unmarried partners. Specifically, the court characterized this relationship as "inappropriate" (while comparing it to a heterosexual adulterous relationship), as a relationship that is not "condoned," and as a relationship "without the cloak of a marital relationship." The court noted in such situations, "I have often, time and time again, restricted visitation. I think that's only appropriate.... It is certainly inappropriate to do something other than restrict the relationship." While ordering appellant not to have visitation in the presence of Donathan or any other female or male companion, the court emphasized that "[i]t is clear to me that we'll have no situation where you have a live-in companion."

In *Davis*, the Court of Appeals put an end to the long-held practice of presuming a parent in an adulterous relationship unfit to have custody of a minor child. The Court stated:

We now explicitly hold ... that whereas the fact of adultery may be a relevant consideration in child custody awards, no presumption of unfitness on the part of the adulterous parent arises from it; rather it should be weighed, along with all other pertinent factors, only insofar as it affects the child's welfare.

*Davis*, 280 Md. at 127, 372 A.2d 231. In *Swain*, 43 Md.App. at 629, 406 A.2d 680, we said that the mere fact of adultery cannot "tip the balance" against a parent in a fitness determination. Rather, "a [court] should weigh, not the adultery itself, but only *any actual harmful effect that is supported by the evidence.*" *Id.* (emphasis added).

In *North*, we noted that an appellate court must determine whether a chancellor's visitation schedule denies a parent access to his or her children "at reasonable times." *North*, 102 Md.App. at 12, 648 A.2d 1025. Concurrently, we must evaluate the court's statement of reasons for its Order and determine whether the facts found by the court support the announced objective. *Id.* at 14–15, 648 A.2d 1025. Overnight visitation is not an inalienable right, to be sure, but it is

perfectly reasonable as a starting point, and is a standard visitation award. The court in the case *sub judice* articulated no findings of actual harm to the children that the evidence indicated would result from the children's exposure to appellant's present or future non-marital sexual relationships, but inferred that such exposure would be *per se* harmful to the children by virtue of the relationship's inherently "inappropriate" nature.

Were this a custody case, the court's action would unquestionably have violated *Davis* and *Swain*. That this case concerns visitation does not affect this conclusion. Although the Court of Appeals has recognized that visitation is a "considerably less weighty matter" than custody and does not demand the enhanced protections of parental rights that attend custody awards, *see Fairbanks v. McCarter*, 330 Md. 39, 48, 622 A.2d 121 (1993), it is also true that visitation is awarded to fulfill the needs of the child rather than the needs of the parent. *Id.* at 49, 622 A.2d 121. In addition, the Court of Appeals has recently stated that "[v]isitation, which is considered to be a form of temporary custody, and custody determinations are generally governed by the same principles." *Beckman v. Boggs*, 337 Md. 688, 703, 655 A.2d 901 (1995).

■■■ This necessary focus on the welfare of the children, rather than on the rights of the parent, dictates that we apply *Davis* and *Swain* in the context of visitation awards. Because children spend less time visiting with a non-custodial parent than living with a custodial parent, a child probably would suffer less harm by visiting with a parent living in a non-marital relationship than by living with one in such a relationship. To allow an inference of harm to the child in a visitation context while prohibiting such an inference in the custody context would not promote the goal of protecting the child's best interests. The court articulated no reasons for the restriction other than the "inappropriateness" of the relationship, and it failed to state on the record how the children might be harmed by exposure to the relationship. Given the

testimony of Kabriel, Standley, Officer Parsons, and Officer Bauman, we hold that there was no evidentiary basis for the court to conclude the relationship was harmful to the children. Hence, the court could not have articulated any harmful effect, since there was no evidence to support such a finding. There was therefore no showing that the restriction was necessary to prevent any adverse impact on the children.

### iii

We next briefly discuss the court's prohibition of any visitation of the children by the father in the presence of anyone "having homosexual tendencies or such persuasions, male or female...." The court made no findings of fact at all justifying this blanket prohibition, which encompasses, it appears, every situation in which appellant and the children may be in the company of homosexuals. No testimony in the record supports this prohibition on contact of any kind with homosexuals. Certainly the court said nothing about it in its oral statements and made no finding of harm to the children from such contact. Under *North*, this prohibition clearly cannot stand.

### III

Finally, we turn to appellant's last contention on appeal—that the circuit court erred by ordering appellant to pay all unreimbursed medical expenses for the children rather than split the costs of those expenses according to income, as required by MD.CODE ANN., FAM.LAW § 12–204 (F.L.) (1991 Repl.Vol., 1996 Supp.), and without detailing the reasons for any departure from the Maryland Child Support Guidelines on the record as required by F.L. § 12–202(a)(2)(iv). We agree. F.L. § 12–204(h) provides that

[a]ny extraordinary medical expenses incurred on behalf of a child shall be added to the basic child support obligation and shall be divided between the parents in proportion to their adjusted actual income.

F.L. § 12–202(a)(2)(iv) makes very clear that a departure from the Guidelines must be supported by the court's written finding or a specific finding on the record stating the reasons for departure. *Id.; see also Reuter v. Reuter*, 102 Md.App. 212, 235, 649 A.2d 24 (1994). Here, the court ordered appellant to pay the standard amount of child support under the Guidelines in addition to all of the children's unreimbursed medical expenses. The court stated no reasons for declining to split extraordinary medical expenses according to income,[10] nor reasons for ordering appellant to pay any unreimbursed medical expenses not classified as extraordinary, in addition to the amount specified in the Guidelines.

Appellee argues that appellant had agreed, before entry of judgment, to pay all unreimbursed medical expenses and that appellant failed to make a satisfactory legal argument in his initial brief. For the latter mistake, appellee argues, we should dismiss this point of appeal. We disagree. Though hardly thorough, appellant does argue in his initial brief that the court failed to note its reasons for departing from the Guidelines in accordance with F.L. § 12–202. That is the gravamen of his contention, and it is the ground upon which we vacate the court's Order. *In re Joshua W.*, 94 Md.App. 486, 504, 617 A.2d 1154 (1993) (vacating court's departure from Guidelines absent stated reasons for departure).

As for appellee's first objection—that appellant agreed to pay all of the children's unreimbursed medical expenses—the existence of such an agreement *vel non* is quite beside the point, for it cannot absolve the circuit court of the responsibility for making the requisite findings on the record that justify a departure from the Guidelines. *Shrivastava v. Mates*, 93

10. F.L. § 12–204(h) mandates the splitting of "extraordinary" medical expenses only, which F.L. § 12–201(h) defines as uninsured medical expenses over $100 for a single illness or condition. F.L. § 12–201(h)(1). It includes reasonable, uninsured, and necessary costs for orthodontia, dental treatment, asthma treatment, physical therapy, treatment for any chronic health problem, and professional counseling or psychiatric therapy for diagnosed mental disorders. F.L. § 12–201(h)(2).

Md.App. 320, 329–30, 612 A.2d 313 (1992). We remand for the requisite findings on the record.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COST TO BE PAID BY APPELLEE.**

**CLERK OF THE CIRCUIT COURT TO TRANSMIT CERTIFIED COPY OF MORNING PROCEEDINGS OF APRIL 5, 1996 TO THIS COURT AS ORDERED WITHIN THIS OPINION.**